# United States Court of Appeals
## For the First Circuit

Nos. 07-2012; 07-2070; 07-2326; 07-2327

CONCILIO DE SALUD INTEGRAL DE LOIZA, INC.;
DR. JOSÉ S. BELAVAL, INC.,

Plaintiffs, Appellants/Cross-Appellees,

RIO GRANDE COMMUNITY HEALTH CENTER, INC.

Plaintiff,

v.

ROSA PÉREZ-PERDOMO,
Secretary, Department of Health of
the Commonwealth of Puerto Rico,

Defendant, Appellee/Cross-Appellant,

COMMONWEALTH OF PUERTO RICO; UNITED STATES DEPARTMENT OF HEALTH
AND HUMAN SERVICES; MICHAEL LEAVITT, Secretary, United States
Department of Health and Human Services,

Defendants.

APPEALS FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

[Hon. Gustavo A. Gelpí, U.S. District Judge]

Before

Lynch, Chief Judge,
Selya and Boudin, Circuit Judges.

Robert A. Graham with whom James L. Feldesman, Feldesman
Tucker Leifer Fidell LLP, and Ignacio Fernandez de Lahongrais were
on brief for appellants/cross-appellees.

Luis A. Rodríquez-Muñoz with whom Eduardo Vera-Ramírez, Eileen Landrón-Guardiola, Landrón & Vera, LLP, Roberto Sánchez-Ramos, Secretary of Justice, and Salvador Antonetti-Stutts, Solicitor General, were on brief for appellee/cross-appellant.

December 15, 2008

**LYNCH**, **Chief Judge**. Federally-qualified health centers ("FQHCs") provide healthcare to medically underserved populations. Federal Medicaid law obligates the Commonwealth of Puerto Rico to make "wraparound" payments to FQHCs. 42 U.S.C. § 1396a(bb)(5). The Commonwealth, through its Secretary of Health, has for many years now not fulfilled this legal obligation, except under the duress of injunctive orders.

In 2003, plaintiffs Concilio de Salud Integral de Loiza, Inc. ("Loiza") and Dr. José S. Belaval, Inc. ("Belaval"), along with one other FQHC, brought suit against the Secretary of Puerto Rico's Department of Health under 42 U.S.C. § 1983 for failure to make the required payments. The plaintiffs sought declaratory and prospective injunctive relief.

This is the fourth appeal resulting from this litigation; the background is set forth in our three earlier opinions. See Dr. José S. Belaval, Inc. v. Pérez-Perdomo (Belaval III), 488 F.3d 11 (1st Cir. 2007) (reversing district court's dismissal, on the basis of the unclean hands doctrine, of Belaval's claims to equitable relief); Dr. José S. Belaval, Inc. v. Pérez-Perdomo (Belaval II), 465 F.3d 33 (1st Cir. 2006) (reinstating the preliminary injunction that required payment to Belaval and that had been erroneously modified); Rio Grande Cmty. Health Ctr., Inc. v. Rullan (Belaval I), 397 F.3d 56 (1st Cir. 2005) (affirming an order of relief requiring prospective payment to Loiza).

On March 27, 2007, the district court vacated the preliminary injunction it had issued in 2004, after finding that defendant had come into compliance with the statute. Subsequently, the court dismissed plaintiffs' claims as moot and issued a final judgment, along with a permanent injunctive order. The issue before us is essentially whether the district court erred in finding the Commonwealth had finally met its obligations and, on this basis, dissolving the 2004 preliminary injunction which required defendant to establish and implement a system of payments in compliance with § 1396a(bb), and dismissing the case. The court was in error, and we reverse and remand.

I.

We briefly recount the facts and procedural history essential to this appeal.

FQHCs are entitled to receive payment for the services they provide to Medicaid patients under 42 U.S.C. § 1396a(bb). If a state employs a managed care approach to running its Medicaid system, as the Commonwealth does,[1] then its payment obligations are controlled by § 1396a(bb)(5). In a managed care system, the state Medicaid agency contracts with managed care organizations ("MCOs"), which in turn contract with FQHCs to provide Medicaid services. See Belaval I, 397 F.3d at 62. MCOs are also commonly referred to

_____

[1] Puerto Rico is a state for Medicaid purposes, and we refer to it as such. Belaval I, 397 F.3d at 61 (citing 42 U.S.C. § 1301(a)(1)).

as health maintenance organizations -- or HMOs. Section 1396a(bb)(5) requires the state regularly to make supplemental, wraparound payments to cover the difference between what FQHCs are paid under their MCO contracts and the total reimbursement to which they would otherwise be entitled under the Medicaid statute. The statute requires such payments to be made at least three times per year. Belaval I, 397 F.3d at 62 (citing 42 U.S.C. § 1396a(bb)(5)).

Congress has created a detailed scheme for calculating these wraparound payments. See id. at 61-62. Section 1396a(bb)(5)(A) provides:

> [T]he State plan shall provide for payment to the center or clinic by the State of a supplemental payment equal to the amount (if any) by which the amount determined under paragraphs (2), (3), and (4) of this subsection exceeds the amount of the payments provided under the contract [between the FQHC and the MCO].

Paragraphs (2), (3), and (4) of § 1396a(bb), in turn, provide the methodology for calculating entitlements in non-managed care systems; in the context of Puerto Rico's managed care system, this number represents the FQHC's gross entitlement from which MCO payments are deducted. Under this methodology, an FQHC's total "reasonable" costs for providing Medicaid services in 1999 and 2000 are divided by the total number of visits by Medicaid patients in those two years. For any year following fiscal year 2001, this per visit average is multiplied by a standard measure of inflation and

then multiplied by the number of visits in that year.  See 42 U.S.C. § 1396a(bb)(2)-(3); Belaval I, 397 F.3d at 61-62.  The amount due to an FQHC in wraparound payments is then found by subtracting from this number the "payments provided under the [MCO] contract."  42 U.S.C. § 1396a(bb)(5)(A).

Congress created the wraparound requirement for FQHCs in 1997, and it made this particular statutory scheme -- known as the prospective payment system ("PPS") -- effective after fiscal year 2000.  Belaval I, 397 F.3d at 61, 62 n.3.  Nonetheless, the Commonwealth failed promptly to establish a PPS, and as of June 2003, when plaintiffs brought suit,[2] the Commonwealth had not made any wraparound payments.  Id. at 62.

Loiza and Belaval moved for a preliminary injunction on January 7, 2004.  Loiza also filed a motion for a temporary restraining order on March 1, 2004, seeking emergency relief due to its precarious financial situation.  On March 31, 2004, the district court entered an order granting Loiza its requested emergency relief.  The order directed defendant to make the first quarter 2004 payment to Loiza by April 7, 2004.  For the purposes of the injunction, defendant was instructed to calculate the payments using the methodology suggested by the government's

---

[2]    The original defendant was Johnny Rullan, who served as Secretary of Health at the commencement of the suit.  He has since been substituted as a defendant by Rosa Pérez-Perdomo, the current Secretary.

auditor, with the exception of a few court-ordered variations. See Belaval I, 397 F.3d at 66. This "rough methodology" was intended to be used until a permanent PPS was established. Id. at 76-77. The court's decision to issue the March 31, 2004 order was upheld in our first opinion in this case. See id. at 77.

On November 1, 2004, the court granted Loiza and Belaval's motion for preliminary injunction. The injunction ordered that:

> i. Defendant shall, on or before November 30, 2004, fully implement its "wraparound" payment system, so as to fully comply with the FQHC requirements of the Medicaid statute, for the purpose of providing such payments thereunder to plaintiffs.
> ii. The defendant shall certify to the Court no later than November 30, 2004, that its "wraparound" payment plan is in effect.
> iii. On or before December 10, 2004, defendant shall pay to the appearing plaintiffs which are currently operating all pending supplemental payments for 2004.

Defendant failed to comply, see Belaval III, 488 F.3d at 13, and extended wrangling ensued over the amount that defendant was required to pay plaintiffs under the injunction.

The disputes centered on two issues related to the interpretation of the statute's calculation methodology provisions, which may be termed the "pure Medicaid" and the "phantom MCO payment" issues. First, plaintiffs contested defendant's position that, in calculating the number of patients served by an FQHC, only "pure Medicaid" patients should be taken into account. Defendant

-7-

maintained that the state's payment obligations extend only to services rendered by FQHCs to the category of individuals whose coverage is <u>mandatory</u> under the federal Medicaid statute and the Commonwealth's state plan. Plaintiffs argued that their wraparound reimbursements must account for services rendered to <u>all</u> individuals <u>eligible</u> under the state plan. Plaintiffs say the "pure Medicaid" modifier in defendant's formula would deprive them of payments for approximately one-third of the Medicaid enrollees assigned to them.

Second, the parties disagreed over the proper interpretation of the phrase "payments provided under the contract" in § 1396a(bb)(5). Defendant contended that this phrase allows her to deduct the amount <u>owed</u> to an FQHC by its MCO under the terms of the contract between those two entities. Plaintiffs countered that the phrase takes into account only those payments actually <u>received</u> by the FQHC, and that defendant's methodology allowed her impermissibly to offset their entitlements by "phantom MCO payments." Plaintiffs argued before the district court that the payments actually made by MCOs often fall well short of the amounts budgeted by contract. Defendant countered that this discrepancy is the result of debts owed by plaintiffs to their MCOs, and that there is no difference under the terms of the statute between direct payments made by the MCOs to plaintiffs and payments made in the form of credit to plaintiffs' debts; if plaintiffs are

unsatisfied with these payments, defendant argued, they are free to bring suit against the MCOs.

The deduction of "phantom MCO payments" would also have a considerable effect on plaintiffs. For example, under defendant's formula, the state's payment obligations to Belaval for the third quarter of 2006 would have been offset by $814,182.52 in budgeted capitation payments; according to Belaval, the deduction should only have been $214,354.65 -- the actual MCO payment reported in Belaval's invoices.

Each time a payment came due under the injunction, defendant argued to the court that, according to her calculations, plaintiffs were owed nothing under the statute. Employing the "pure Medicaid" modifier and accounting for "phantom MCO payments," defendant presented calculations that consistently showed plaintiffs' MCO payments exceeded their reimbursable costs for a given period. Plaintiffs responded by arguing that there is no basis in law for the "pure Medicaid" modifier and that the deduction of MCO payments not actually received violates the terms of § 1396a(bb)(5).

The district court resolved these disputes only in part. It established that payments under the November 1, 2004 preliminary injunction should be calculated using the same rough interim methodology it had prescribed in its March 31, 2004 order. This interim methodology was based primarily on the suggestions of the

government's auditor, and so it did employ the "pure Medicaid" modifier. However, at no point did the court reach any legal conclusions as to whether the "pure Medicaid" modifier was mandated or permitted under § 1396a(bb).[3]

As to the "phantom MCO payment" issue, the district court did come to a legal conclusion: in an October 6, 2005 order, the court held that § 1396a(bb)(5) barred the deduction of "phantom MCO payments." It interpreted the phrase "payments provided under the contract," 42 U.S.C. § 1396a(bb)(5)(A), to allow the deduction only of amounts actually paid by the MCO to the FQHC.

Thus, at each point, the court rebuffed defendant's protests and ordered defendant to make payments based on the court's rough methodology; these payment were in amounts greater than those derived from defendant's proposed methodology, but presumably lower than what would have been derived from plaintiffs' proposed methodology (which would have omitted the "pure Medicaid" modifier). Under these orders, defendant made wraparound payments to Loiza through the fourth quarter of 2006 and to Belaval through the first quarter of 2007.

On June 29, 2006, defendant informed the district court that the Commonwealth had established an Office for the Calculation

---

[3] The court's decision to administer the injunction according to these terms was based in part on a compromise offered by Loiza after the parties had failed to reach an agreement over the amounts owed under the injunction.

and Management of the Prospective Payment System ("PPS Office"), which would be responsible for calculating and paying future reimbursements owed to FQHCs under the statute. In response, the district court ordered the parties to "simultaneously show cause as to why the preliminary injunction in this case should not be converted to a permanent injunction at this time, and a special master appointed to oversee compliance with all future wraparound payments." On December 7, 2006, the district court held an evidentiary hearing "to determine whether the Commonwealth's PPS office duly complies with [§ 1396a(bb)]." At the hearing, the court switched directions. Instead of considering whether a special master should be appointed and the preliminary injunction converted into a permanent injunction, the court announced that if it found the PPS Office was fully functioning, it would vacate the preliminary injunction.

On March 27, 2007, the district court issued an order vacating the preliminary injunction. It found that the establishment of a permanent PPS Office brought defendant into "present compliance with the wraparound payment statute." It noted that no challenge was raised as to "the contents of [the PPS Office's] employee and FQHC manuals" or to "the qualifications of [its] staff." More importantly, it found that the Office "[had] in fact issued non-court-ordered wraparound payments" to other FQHCs. Thus, it held there was no question that the Commonwealth had

-11-

established a functioning PPS Office that could "readily and properly calculate Loiza's wraparound due payments." Its conclusion that the Office could "properly calculate" the payments was made without any reference to or resolution of the two disputed issues about methodology. Finally, the court rejected the concern that the PPS Office would be unable to make payments in the future due to the fact that, in contrast with other states, the Commonwealth allegedly "receives but a fraction of Medicaid monies from the federal government." This concern, the court said, was speculative, and as far as Loiza and Belaval were concerned, defendant had always been able to make the court-ordered payments.

After finding that defendant had come into compliance with § 1396a(bb) and vacating the preliminary injunction, the district court ruled that "[b]ecause all further relief sought in the complaint has now become a moot matter, the case is hereby closed." It entered final judgment. That judgment also enjoined defendant to "continue using the 2001 baseline calculation data adopted by the court" in its March 31, 2004 temporary restraining order.[4] Neither plaintiffs nor defendant had sought such an injunction and all parties complain about it on appeal.

_____

[4] The court's March 27, 2007 order applied only to Loiza, since the district court had previously dismissed Belaval as a party to the case. Following our reversal of this decision, see Belaval III, 488 F.3d at 17, the district court expanded its judgment to include Belaval.

-12-

Both sides appealed. Plaintiffs appealed from the district court's orders vacating the preliminary injunction and dismissing the case and from the terms of the permanent injunction entered. Defendant appealed from the permanent injunction.

Neither Loiza nor Belaval has received wraparound payments for any period post-dating the dissolution of the preliminary injunction. To put it another way, the only wraparound payments defendant has ever made to plaintiffs were made as a result of injunctive orders. The final payment that Loiza received was for the fourth quarter of 2006; the final payment that Belaval received was for the first quarter of 2007.[5] Defendant admitted at oral argument that no payments have been made to either plaintiff for periods following the dissolution of the preliminary injunction; the reason was that, according to her calculations and on the basis of the information presently available to the PPS Office, none were due.

---

[5] The district court's March 27, 2007 order stated that the dissolution of the preliminary injunction would apply only prospectively, such that the court would still enforce Loiza's previously filed request for payment, under the injunction, for the third and fourth quarters of 2006. The court ordered defendant to make this payment shortly thereafter, and defendant complied. When Belaval's claims were reinstated following our decision in Belaval III, the court granted Belaval's request for payments for the final periods covered by the injunction.

II.

A.        Dissolving the Preliminary Injunction

We review a district court's decision to dissolve a preliminary injunction for abuse of discretion.  See Naser Jewelers, Inc. v. City of Concord, 513 F.3d 27, 32 (1st Cir. 2008) ("Appellate review of the denial of a preliminary injunction is for abuse of discretion."); Knapp Shoes, Inc. v. Sylvania Shoe Mfg. Corp., 15 F.3d 1222, 1228 (1st Cir. 1994) ("A decision to vacate an existing preliminary injunction is . . . the effective equivalent of a denial of a preliminary injunction . . . ."); see also Hoult v. Hoult, 373 F.3d 47, 53 (1st Cir. 2004); Burlington N. & Santa Fe Ry. Co. v. Bhd. of Locomotive Eng'rs, 367 F.3d 675, 678 (7th Cir. 2004); Sprint Commc'ns Co. v. CAT Communc'ns Int'l, Inc., 335 F.3d 235, 241 (3d Cir. 2003); 16 Wright, Miller & Cooper, Federal Practice and Procedure § 3924.2 (2d ed. 1996).  This standard is deferential, see Waterproofing Sys., Inc. v. Hydro-Stop, Inc., 440 F.3d 24, 28 (1st Cir. 2006); Burlington, 367 F.3d at 678, and "[t]he fact that the court that issued an injunction has been persuaded to modify or dissolve it . . . is weighty evidence of sufficient cause," 16 Wright, Miller & Cooper, supra, § 3924.2.

Yet deference has its limits: we review issues of law underlying such a decision de novo.  See O'Brien v. Mass. Bay Transp. Auth., 162 F.3d 40, 42-44 (1st Cir. 1998); Knapp, 15 F.3d at 1225-27; see also P.R. Hosp. Supply, Inc. v. Boston Scientific

-14-

Corp., 426 F.3d 503, 505 (1st Cir. 2005); Hoult, 373 F.3d at 53; Burlington, 367 F.3d at 678; Sprint, 335 F.3d at 242 n.7. Findings of fact are reviewed for clear error. See P.R. Hosp. Supply, 426 F.3d at 505; Hoult, 373 F.3d at 53; Burlington, 367 F.3d at 678; Sprint, 335 F.3d at 242 n.7.

It is true that when we held in 2006 that the district court had erred in modifying the November 1, 2004 preliminary injunction in 2005, we also noted that the district court could modify the injunction under Fed. R. Civ. P. 60(b)(5) if defendant could "show that 'it is no longer equitable that the judgment should have prospective application,' and that there has been the kind of 'significant change' in circumstances that the Rule requires." Belaval II, 465 F.3d at 38. A change in operative fact may serve as a basis for vacating a preliminary injunction. See Agostini v. Felton, 521 U.S. 203, 215 (1997) ("[I]t is appropriate to grant a Rule 60(b)(5) motion when the party seeking relief from an injunction . . . can show a 'significant change either in factual conditions or in law.'" (quoting Rufo v. Inmates of Suffolk County Jail, 502 U.S. 367, 384 (1992)); Sprint, 335 F.3d at 242 ("[T]he standard that the district court must apply when considering a motion to dissolve [a preliminary] injunction is whether the movant has made a showing that changed circumstances warrant the discontinuation of the order." (quoting Twp. of Franklin Sewerage Auth. v. Middlesex County Utils. Auth., 787 F.2d

-15-

117, 121 (3d Cir. 1986)) (internal quotation marks omitted)); 11A Wright, Miller & Kane, Federal Practice and Procedure § 2961 (2d ed. 1995).

The district court determined in its March 27, 2007 order that vacatur of the preliminary injunction was appropriate because defendant had come into full compliance with the Medicaid statute.[6] The district court held, and defendant now maintains, that setting up an office for making wraparound payments was sufficient for compliance under § 1396a(bb)(5) and that this was the only issue the court needed to consider.  That is, defendant argues that by creating a PPS Office that is capable of issuing payments, she had completely fulfilled her obligations under the law, such that

_____

[6]      While compliance by the enjoined party may constitute a significant change in operative fact, see Fortin v. Comm'r of the Mass. Dep't of Pub. Welfare, 692 F.2d 790, 800 n.13 (1st Cir. 1982); 11A Wright, Miller & Kane, supra, § 2961, compliance is not always sufficient to warrant vacatur of an injunction.  "When dissolution [of an injunction] would reinstate the harm prohibited by the decree, . . . the decree may persist even in the face of compliance."  Fortin, 692 F.2d at 800 n.13.  Notwithstanding the creation of the new PPS Office, defendant had never made any payments to Loiza or Belaval except under court order.  Further, in 2004, defendant argued to the court that an "Office of Medical Assistance" had been set up to fulfill the Commonwealth's obligations under § 1396a(bb).  Plaintiffs allege this office had substantially the same powers and duties as the PPS Office and that it never followed through on its obligations.  Given this track record, plaintiffs argue that there was no reason for the district court to think that defendant would comply without continued judicial oversight. Plaintiffs' arguments are not unreasonable in light of subsequent developments: defendant in fact made no payments for periods following the dissolution of the injunction. Because we reverse on other grounds, we need not reach the question of whether the court's decision in this regard was an abuse of discretion.

-16-

plaintiffs could have no further claims for relief. Not so. The district court's conclusion that defendant's actions were sufficient to bring her into "present compliance with the wraparound payment statute" was legal error.

Federal law, 42 U.S.C. § 1396a(bb)(5), requires not only that the Commonwealth set up a system for making wraparound payments but that these payments be properly calculated and made. Defendant cannot be in compliance with the statute unless the system she has implemented employs an appropriate methodology for calculating wraparound payments. Plaintiffs have consistently alleged that the formula used by defendant to calculate the amounts due to them in wraparound payments violates the terms of § 1396a(bb). That defendant now maintains, as she had at numerous points while the injunction was still in place, that no payment is due under her formula means that a live and unresolved material controversy exists, one which has been part of the case from the start.

The district court, however, did not rule on whether the formula adopted by the PPS Office was in compliance with the methodology provisions of § 1396a(bb), nor did it fully determine what constitutes compliance under these provisions. It made no conclusions as to the legality of the "pure Medicaid" modifier and no factual findings as to whether defendant had complied with its

2005 ruling rejecting defendant's "phantom MCO payments" argument.[7] The district court erred in refusing to consider and resolve these issues before vacating the preliminary injunction and dismissing on grounds of mootness.

B.        Defendant's Arguments Based on § 1983 and the Eleventh Amendment

Defendant argues that, regardless of what § 1396a(bb) requires, plaintiffs' claims regarding the alleged deficiency of the PPS Office's methodology were beyond the power of the district court to adjudicate by grant of injunctive relief under 42 U.S.C. § 1983, primarily because such injunctive claims would be barred by the Eleventh Amendment.  We disagree.

A cause of action exists under § 1983 for the relief sought here.  In the original 2005 appeal in this matter, we held that "a private action can be brought by an FQHC under [§] 1983 to enforce 42 U.S.C. § 1396a(bb)."  Belaval I, 397 F.3d at 75.  We focused on the language in paragraph (5) requiring the state to make payments, rather than on the language providing the methodology for calculating those payments found elsewhere in that paragraph and in paragraphs (2), (3), and (4).  An FQHC suing under § 1983 may enforce not only its right to receive wraparound

_____

⁷        The propriety of the district court's October 2005 legal conclusion regarding "phantom MCO payments" is not before us. Defendant has not contested that portion of the order on appeal. Neither this issue nor the "pure Medicaid" issue were addressed in our 2005 opinion.  See Belaval I, 397 F.3d at 75.

payments but also its right to have those payments properly calculated.

The precise federal statutory language that forms the basis of plaintiffs' claims regarding methodology, like the portion of the statute discussed in our 2005 opinion, is "rights-creating language because it is mandatory and has a clear focus on the benefitted FQHCs, rather than the regulated states." Belaval I, 397 F.3d at 74. Paragraph (5) specifies that the state plan "shall provide for payment to the center . . . of a supplemental payment equal to the amount . . . by which the amount determined under paragraphs (2), (3), and (4) of this subsection exceeds the amount of the payments provided under the [MCO] contract." 42 U.S.C. § 1396a(bb)(5)(A). Similarly, in paragraphs (2), (3), and (4), the explanations of how the state should calculate the amount it must pay an FQHC for its services are uniformly preceded by the declaration that the state plan "shall provide for payment" for such services in that amount. Id. § 1396a(bb)(2)-(4). These explanations are "highly specific," Belaval I, 397 F.3d at 75, and are written in "individualistic terms, rather than at the aggregate level of institutional policy or practice," id. at 74.

Notably, other circuits have held that the calculation methodology provisions of § 1396a(bb) are enforceable under § 1983. See Pee Dee Health Care, P.A. v. Sanford, 509 F.3d 204, 209-12 (4th Cir. 2007) (holding that a healthcare provider in a non-managed

-19-

care system may sue under § 1983 to enforce its claim that the formula used by the state agency to calculate its reimbursements was improper under § 1396a(bb)); Cmty. Health Ctr. v. Wilson-Coker, 311 F.3d 132, 136, 140 (2d Cir. 2002) (allowing a healthcare provider to pursue a § 1983 claim alleging that the formula used to calculate its reimbursements was improper under § 1396a(bb)(2)); see also Chase Brexton Health Servs., Inc. v. Maryland, 411 F.3d 457, 461, 467 (4th Cir. 2005). Defendant has offered no citation to the contrary.

Plaintiffs' continuing claims for injunctive relief with regard to the payment methodology are not barred by the Eleventh Amendment.[8] Defendant argues that once the PPS Office was established, the only possible dispute that could arise would be over whether the Office, after having reviewed the relevant data for an FQHC in a given pay period, had arrived at the right number; thus, plaintiffs' arguments could only amount to impermissible claims for money damages against the Commonwealth. This argument mischaracterizes plaintiffs' claims. Plaintiffs' complaints are over how the amounts due to them should be calculated in the future. Their consistent arguments that defendant has adopted a methodology that contravenes the terms of § 1396a(bb) constitute allegations of an ongoing violation of federal law. See Verizon

---

[8] Any claims for past non-compliance with the district court's preliminary injunction, though claims for monies due, are also not barred by the Eleventh Amendment.

-20-

Md., Inc. v. Pub. Serv. Comm'n, 535 U.S. 635, 645-46 (2002). To remedy this alleged violation, plaintiffs seek, as they have since 2003, prospective injunctive and declaratory relief of the sort permissible under Ex parte Young, 209 U.S. 123 (1908). See Edelman v. Jordan, 415 U.S. 651, 667-68 (1974) (recognizing that Ex parte Young allows claims that would have "an ancillary effect on the state treasury" where such an effect is "the necessary result of compliance with decrees which by their terms were prospective in nature"). The claims at issue here are thus permissible under the Eleventh Amendment.

C.      Dismissing the Case and Issuing the Permanent Injunction

Both sides object to the permanent injunction. The district court's decision to enter a permanent injunction was also erroneous. A live dispute exists as to plaintiffs' argument that defendant's payment methodology violates § 1396a(bb).

Plaintiffs' claims clearly were not moot, and plaintiffs could seek further relief under the statute. Defendant also has raised a dispute about the methodology embodied in the permanent injunction, which has not been resolved. The court could not properly enter a final judgment or grant permanent injunctive relief.

D.      Appointing a Special Master

Before dissolving the preliminary injunction, the district court had considered appointing a special master. In

addressing the complex Medicaid issues presented in this case, the district court may be well-advised to do so, within the bounds of Fed. R. Civ. P. 53.  See In re Pearson, 990 F.2d 653, 659-60 (1st Cir. 1993) (discussing "some exceptional condition[s]" that could warrant appointment of a special master); United States v. Horton, 622 F.2d 144, 148-49 (5th Cir. 1980) (upholding the appointment of a special master in a Medicare reimbursement case presenting complex legal issues); see also Nat'l Org. for the Reform of Marijuana Laws v. Mullen, 828 F.2d 536, 542 (9th Cir. 1987) (holding that "the prospect of noncompliance [with a preliminary injunction] is an 'exceptional condition' that justifies reference to a master"); 9C Wright & Miller, Federal Practice and Procedure §§ 2603-05 (3d ed. 2008).  It might also consider invoking its inherent power to appoint a technical advisor.  See Reilly v. United States, 863 F.2d 149, 154-61 (1st Cir. 1988).

## III.

The district court's orders vacating the preliminary injunction, entering final judgment, and issuing permanent injunctive relief are reversed.  The case is remanded for further proceedings consistent with this opinion.  Costs are awarded to Loiza and Belaval.