(Slip Opinion)

# Reconsidering Whether the Wire Act Applies to Non-Sports Gambling

This Office concluded in 2011 that the prohibitions of the Wire Act in 18 U.S.C. § 1084(a) are limited to sports gambling. Having been asked to reconsider, we now conclude that the statutory prohibitions are not uniformly limited to gambling on sporting events or contests. Only the second prohibition of the first clause of section 1084(a), which criminalizes transmitting "information assisting in the placing of bets or wagers on any sporting event or contest," is so limited. The other prohibitions apply to non-sports-related betting or wagering that satisfy the other elements of section 1084(a).

The 2006 enactment of the Unlawful Internet Gambling Enforcement Act did not alter the scope of section 1084(a).

November 2, 2018

MEMORANDUM OPINION FOR THE
ACTING ASSISTANT ATTORNEY GENERAL
CRIMINAL DIVISION

In 2010, the Criminal Division asked whether the Wire Act, 18 U.S.C. § 1084, prohibits New York and Illinois from using the Internet and out-of-state transaction processors to sell lottery tickets to in-state adults. That request arose from a potential conflict between the Wire Act and the Unlawful Internet Gambling Enforcement Act, 31 U.S.C. §§ 5361–5367 ("UIGEA"). In the Criminal Division's view, the Wire Act prohibits such transactions, but UIGEA might permit the interstate routing of certain state lottery transactions.

We answered that request by challenging its underlying premise: that the Wire Act prohibits transmissions unrelated to sports gambling. Instead of analyzing the interplay between the Wire Act and UIGEA, we concluded, more broadly, that the prohibitions of the Wire Act are limited to sports gambling and thus do not apply to state lotteries at all. *See Whether Proposals by Illinois and New York to Use the Internet and Out-of-State Transaction Processors to Sell Lottery Tickets to In-State Adults Violate the Wire Act*, 35 Op. O.L.C. __ (2011) ("2011 Opinion"). Our opinion departed from the position of the Department of Justice, which had successfully brought Wire Act prosecutions for offenses not involving sports gambling.

The Criminal Division has asked us to reconsider the 2011 Opinion's conclusion that the Wire Act is limited to sports gambling. *See* Memoran-

dum for Curtis E. Gannon, Acting Assistant Attorney General, Office of Legal Counsel, from Kenneth A. Blanco, Acting Assistant Attorney General, Criminal Division (May 26, 2017).[1] We do not lightly depart from our precedents, and we have given the views expressed in our prior opinion careful and respectful consideration. Based upon the plain language of the statute, however, we reach a different result. While the Wire Act is not a model of artful drafting, we conclude that the words of the statute are sufficiently clear and that all but one of its prohibitions sweep beyond sports gambling. We further conclude that that the 2006 enactment of UIGEA did not alter the scope of the Wire Act.

## I.

The Wire Act prohibits persons involved in the gambling business from transmitting several types of wagering-related communications over the wires. The prohibitions, located at 18 U.S.C. § 1084, were originally enacted in 1961.[2] Section 1084(a) sets them out:

> Whoever being engaged in the business of betting or wagering knowingly uses a wire communication facility for the transmission in interstate or foreign commerce of bets or wagers or information assisting in the placing of bets or wagers on any sporting event or contest, or for the transmission of a wire communication which entitles the recipient to receive money or credit as a result of bets or wagers, or for information assisting in the placing of bets or wagers,

---

[1] We address this opinion to John Cronan, as the Acting Assistant Attorney General for the Criminal Division, because Assistant Attorney General Brian Benczkowski is recused from this matter.

[2] Pub. L. No. 87-216, § 2, 75 Stat. 491. The provision has been amended three times, although none of those amendments is material to our analysis. *See* Anti-Drug Abuse Act of 1988, Pub. L. No. 100-690, § 7024, 102 Stat. 4181, 4397 (adding section 1084(e), which defines "State"; making conforming amendments; and adding the term "foreign country" to section 1084(b), so that the Wire Act now includes an exception for the transmission of information assisting in the placing of bets or wagers on a sporting event or contest *from* a state or "foreign country" where such betting is legal *into* a state or "foreign country" in which such betting is also legal); Crime Control Act of 1990, Pub. L. No. 101-647, § 1205(g), 104 Stat. 4789, 4831 (amending the definition of "State" in section 1084(e)); Violent Crime Control and Law Enforcement Act of 1994, Pub. L. No. 103-322, § 330016(1)(L), 108 Stat. 1796, 2147 (altering the statutory penalty in section 1084).

shall be fined under this title or imprisoned not more than two years, or both.

Section 1084(a) consists of two general clauses, each of which prohibits two kinds of wire transmissions, creating four prohibitions in total. The first clause bars anyone in the gambling business from knowingly using a wire communication facility to transmit "bets or wagers" or "information assisting in the placing of bets or wagers on any sporting event or contest." *Id*.[3] The second clause bars any such person from transmitting wire communications that entitle the recipient to "receive money or credit" either "as a result of bets or wagers" or "for information assisting in the placing of bets or wagers." *Id*.[4]

The Wire Act's interpretive difficulties arise from the phrase "on any sporting event or contest," which appears immediately after the second prohibition in the first clause. Those words narrow the prohibition on transmitting "information assisting in the placing of bets or wagers" to bets or wagers "on a sporting event or contest." That phrase is not otherwise repeated in section 1084(a). The other three prohibitions thus appear to be naturally read to apply to wire transmissions involving all forms of gambling, not just "bets or wagers on any sporting event or contest." But if that reading is correct, our 2011 Opinion asked, then why would Congress, "having forbidden the transmission of *all* kinds of bets or wagers . . . prohibit only the transmission of information assisting in bets or wagers concerning sports"? 35 Op. O.L.C. __, at *5. Why permit transmissions of information that assists gambling on non-sporting events, but then prohibit transmissions "entitling the recipient to receive money" for

---

[3] The phrase "wire communication facility" is defined to include "any and all instrumentalities, personnel, and services (among other things, the receipt, forwarding, or delivery of communications) used or useful in the transmission of writings, signs, pictures, and sounds of all kinds by aid of wire, cable, or other like connection between the points of origin and reception of such transmission." 18 U.S.C. § 1081.

[4] As our 2011 Opinion explained, the second clause prohibits "the transmission of a wire communication which entitles the recipient *to receive money or credit*" either "as a result of bets or wagers[] *or* for information assisting in the placing of bets or wagers." 35 Op. O.L.C. __, at *4 n.5 (emphases and alterations in original). Reading the second clause to prohibit "the transmission of a wire communication which entitles the recipient to receive money or credit as a result of bets or wagers" or "the transmission of a wire communication . . . for information assisting in the placing of bets or wagers" would be awkward and would duplicate the second prohibition, which covers "information assisting in the placing of bets or wagers on any sporting event or contest."

providing information that assists "in the placing of those lawfully-transmitted bets"? *Id*. at *8. In short, why would Congress have limited just one of the four prohibitions to sports gambling?

Absent any obvious answer to these questions, our 2011 Opinion concluded that the statutory text was ambiguous, and that the "more logical result" was to read section 1084(a)'s prohibitions as parallel in scope and therefore as all limited to sports gambling. *Id*. at *5. In so doing, we recognized that our reading of the statute departed from that of the Criminal Division and of some courts that had addressed the statute. *See id*. at *3. Several district courts had upheld prosecutions involving non-sports gambling, reasoning that the limitation to "sporting event or contest" did not apply to all of section 1084(a)'s prohibitions.[5] On the other hand, the Fifth Circuit had affirmed a district court opinion that found that the "plain reading of the statutory language clearly requires that the object of the gambling be a sporting event or contest." *In re Mastercard Int'l, Inc., Internet Gambling Litig*., 132 F. Supp. 2d 468, 480 (E.D. La. 2001), *aff'd,* 313 F.3d 257 (5th Cir. 2001).[6]

Those prosecutions, of course, were brought by the Department of Justice. In requesting our opinion, the Criminal Division had advised that "[t]he Department has uniformly taken the position that the Wire Act is not limited to sports wagering and can be applied to other forms of interstate gambling[.]" Memorandum for David Barron, Acting Assistant Attorney General, Office of Legal Counsel, Department of Justice, from Lanny A. Breuer, Assistant Attorney General, Criminal Division, Department of Justice (July 12, 2010). In the years before our opinion, the

---

[5] *See United States v. Lombardo*, 639 F. Supp. 2d 1271, 1281 (D. Utah. 2007) (holding that the "sporting event or contest" qualifier does not apply to section 1084(a)'s second clause; noting that this conclusion "aligns with the Tenth Circuit's *Criminal Pattern Jury Instructions*"); Report and Recommendation of United States Magistrate Judge Regarding Gary Kaplan's Motion to Dismiss Counts 3–12, at 4–7, *United States v. Kaplan*, No. 06-CR-337CEJ-2 (E.D. Mo. Mar. 20, 2008) (concluding that the "sporting event or contest" qualifier applies only to the second prohibition in section 1084(a)'s first clause); *see also United States v. Ross*, No. 98 CR. 1174-1 (KMV), 1999 WL 782749, at *2 (S.D.N.Y. Sept. 16, 1999) (suggesting that the term "sporting event or contest" modifies only the second prohibition in section 1084(a)'s first clause); *Vacco v. World Interactive Gaming Corp*., 714 N.Y.S.2d 844, 847, 851–52 (N.Y. Sup. Ct. 1999) (suggesting same).

[6] Since our 2011 Opinion, the First Circuit has observed in dictum that the Wire Act is limited to betting and wagering on "any sporting event or context." *United States v. Lyons*, 740 F.3d 702, 718 (1st Cir. 2014).

Department had advanced that position in court and before Congress.[7] And on several prior occasions, the Criminal Division had prosecuted defendants whose wire communications involved non-sports gambling, including a 1971 prosecution of "a business enterprise involving gambling in the form of numbers writing." *United States v. Manetti*, 323 F. Supp. 683, 687 (D. Del. 1971); *see also United States v. Vinaithong*, No. 97-6328, 1999 WL 561531, at *1 (10th Cir. Apr. 9, 1999) (order and judgment affirming the sentences of defendants who pleaded guilty under the Wire Act for transmission of "gambling information" related to a "gambling enterprise which has been referred to as a mirror lottery").[8] In two congressional hearings in 1998 and 2000, the Criminal Division had acknowledged some uncertainty concerning the scope of the Wire Act and urged Congress to amend the statute to confirm its application to non-sports gambling.[9] But our 2011 Opinion represented a marked shift in

---

[7] *See* Letter for Dennis K. Neilander, Chairman, Nevada Gaming Control Board, from Michael Chertoff, Acting Assistant Attorney General, Criminal Division (Aug. 23, 2002) ("[T]he Department of Justice believes that federal law prohibits gambling over the Internet, including casino-style gambling."); *Unlawful Internet Gambling Funding Prohibition Act and the Internet Gambling Licensing and Regulation Commission Act: Hearing Before the Subcomm. on Crime, Terrorism, & Homeland Security of the H. Comm. on the Judiciary*, 108th Cong. 70 (2003) (response of John G. Malcolm, Deputy Assistant Attorney General, Criminal Division, to questions for written submission from Rep. Goodlatte) ("The Department of Justice has long held, and continues to hold, the position that 18 U.S.C. § 1084 applies to all types of gambling, including casino-style gambling, not just sports betting."); Letter for Carolyn Adams, Superintendent, Illinois Lottery, from Laura H. Parsky, Deputy Assistant Attorney General, Criminal Division (May 13, 2005) (explaining that if Illinois permitted online purchase of state lottery tickets it would be in violation of federal law—so long as the "transmission [were] routed outside of the state"); *Establishing Consistent Enforcement Policies in the Context of Online Wagers: Hearing Before the H. Comm. on the Judiciary*, 110th Cong. 13 (2007) (statement of Catherine Hanaway, U.S. Attorney) ("It is the Department's view, and that of at least one federal court (the E.D. Mo.), that [the Wire Act] applies to both sporting events and other forms of gambling, and that it also applies to those who send or receive bets in interstate or foreign commerce, even if it is legal to place or receive bets in both the sending jurisdiction and the receiving jurisdiction.").

[8] The Criminal Division advises that the Department secured at least seventeen Wire Act convictions between Fiscal Years 2005 and 2011 that involved non-sports betting.

[9] *Compare, e.g.*, *Internet Gambling Prohibition Act of 1997: Hearings on H.R. 2380 Before the Subcomm. on Crime of the H. Comm. on the Judiciary*, 105th Cong. 78 (1998) (statement of Kevin DiGregory, Deputy Assistant Attorney General, Criminal Division) ("That being said, [section 1084] currently prohibits someone in the business of betting and wagering from using a wire communication facility for the transmission in interstate

how the Department interpreted the statute, including with respect to some successful prosecutions.

## II.

The Criminal Division has asked us to reconsider our 2011 Opinion. We do not lightly depart from our precedent. But having reconsidered our conclusion, we now reach a different result. The 2011 Opinion, in our view, incorrectly interpreted the limitation "on any sporting event or contest" (the "sports-gambling modifier") to apply beyond the second prohibition that it directly follows: the prohibition on transmitting "information assisting in the placing of bets or wagers."

## A.

Section 1084(a)'s first clause makes it a crime to use the wires "for the transmission in interstate or foreign commerce of bets or wagers or information assisting in the placing of bets or wagers on any sporting event or contest." Our 2011 Opinion concluded that this clause was ambiguous on whether the sports-gambling modifier applies to both prohibitions in the first clause. 35 Op. O.L.C. __, at *5. We reasoned that "[t]he text itself

---

or foreign commerce of bets or wagers on any sporting event or contest. . . . [T]he statute may relate only to sports betting and not to the type of real-time, interactive gambling that the Internet now makes possible for the first time. Therefore, we generally support the idea of amending the Federal gambling statutes by clarifying that the Wire Communications Act applies to interactive casino betting[.]"); *Internet Gambling Prohibition Act of 1999: Hearing Before the Subcomm on Telecommunications, Trade, & Consumer Protection of the H. Comm. on Commerce*, 106th Cong. 35 (2000) (statement of Kevin DiGregory, Deputy Assistant Attorney General, Criminal Division) ("We urge you to consider a proposal that we have made, and I will highlight what that proposal would do. It would clarify that [section] 1084 applies to all betting and not just betting on sporting events or contests. . . . Our proposed amendment, Mr. Chairman and members of the committee, would not prohibit any gambling currently permitted nor would our proposal permit anything that is currently prohibited."), *with id.* at 88 (answering question from Rep. Tauzin and explaining that "[s]ection 1084 applies to sports betting but not to contests like a lottery"). In a 1962 speech shortly following the passage of the Wire Act, then-Assistant Attorney General for the Office of Legal Counsel Nicholas deB. Katzenbach explained that, under the Wire Act, "gamblers, bookies and related members of their fraternity are barred from using the phones for the interstate transmission of wagers on sporting events or contests," without addressing whether the statute was limited to such wagering. Nicholas deB. Katzenbach, Assistant Attorney General, Office of Legal Counsel, Address on Federal and Local Cooperation in Fighting Crime (Jan. 25, 1962).

can be read either way" because section 1084(a) lacks "a comma after the first reference to 'bets or wagers'"; we thought that such a comma would have made it "plausible" that the first prohibition in the first clause was not limited to sports-based gambling. *Id*. "By the same token," we continued, "the text does not contain commas after *each* reference to 'bets or wagers,'" which we would have considered evidence that the sports-gambling modifier qualified each prohibition in the first clause. In light of this perceived ambiguity, we interpreted both prohibitions in the first clause as confined to sports gambling because that reading "produce[d] the more logical result" and was supported by the legislative history. *Id*. at *5–7.

We do not believe that the first clause is ambiguous, however. "It is well established that 'when the statute's language is plain, the sole function of the courts—at least where the disposition required by the text is not absurd—is to enforce it according to its terms.'" *Lamie v. U.S. Trustee*, 540 U.S. 526, 534 (2004) (quoting *Hartford Underwriters Ins. Co. v. Union Planters Bank, N.A.*, 530 U.S. 1, 6 (2000)); *see also Sebelius v. Cloer*, 569 U.S. 369, 381 (2013) (same). There was no need for Congress to add a comma to clarify that the sports-gambling modifier applies only to the second prohibition in the first clause, because the grammar of the provision itself accomplishes that task. The sports-gambling modifier comes at the end of a complex modifier that defines the type of "information" reached by section 1084(a)'s second prohibition: "information *assisting in the placing of bets or wagers on any sporting event or contest*." 18 U.S.C. § 1084(a) (emphasis added). Since "assisting in the placing of bets or wagers" modifies only the prohibition on transmitting information, it follows that "on any sporting event or contest"—a component of the same modifier—is similarly limited.

Traditional canons of statutory construction confirm that conclusion. In construing the reach of modifiers like "on any sporting event or contest," the default rule is that "'a limiting clause or phrase . . . should ordinarily be read as modifying only the noun or phrase that it immediately follows.'" *Lockhart v. United States*, 136 S. Ct. 958, 962 (2016) (quoting *Barnhart v. Thomas*, 540 U.S. 20, 26 (2003)); *see also Barnhart*, 540 U.S. at 26 ("Referential and qualifying words and phrases, where no contrary intention appears, refer solely to the last antecedent") (quoting 2A Norman J. Singer, *Statutes and Statutory Construction* § 47.33, at 369 (6th rev. ed. 2000)); *United States v. Loyd*, 886 F.3d 686, 688 (8th Cir. 2018) (describing the rule as "a rebuttable presumption in statutory interpretation"); *In*

*re Sanders*, 551 F.3d 397, 399 (6th Cir. 2008) (similar). That rule, the "last-antecedent rule," "reflects the basic intuition that when a modifier appears at the end of a list, it is easier to apply that modifier only to the item directly before it." *Lockhart*, 136 S. Ct. at 963; *see also* Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 152 (2012) ("Scalia & Garner").[10]

In *Lockhart*, for example, the Court applied this rule to a statute that subjected a criminal defendant to increased penalties if the defendant had "'a prior conviction . . . under the laws of any State relating to aggravated sexual abuse, sexual abuse, or abusive sexual conduct involving a minor or ward.'" 136 S. Ct. at 962 (quoting 18 U.S.C. § 2252(b)(2)). The Court held that the phrase "involving a minor or ward" modified only the one item on this list that immediately preceded it. *Id*. at 961. Similarly, in *Barnhart*, the Court considered the meaning of a statutory reference to circumstances in which someone "'is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy.'" 540 U.S. at 23 (quoting 42 U.S.C. § 423(d)(2)(A)). The Court applied the rule of the last antecedent to conclude that the qualifier "which exists in the national economy" could reasonably be read to modify only its closest referent: "any other kind of substantial gainful work." *Id*. at 26. And in *Loyd*, the Eighth Circuit applied the last-antecedent rule to a statute that made a mandatory minimum sentence applicable to anyone with a prior conviction under enumerated federal laws "'or under the laws of any State relating to'" certain types of sexual misconduct. 886 F.3d at 687 (quoting 18 U.S.C. § 2251(e)). The court held that the sexual misconduct language "modifies only the phrase that immediately precedes it: 'the laws of any State.'" *Id*. at 688 (quoting 18 U.S.C. § 2251(e)). As in the examples discussed in those cases, the Wire Act's reference to gambling "on any sporting event or contest" modifies only the phrase it immediately follows: "information assisting in the placing of bets or wagers."

We have considered whether the series-qualifier rule might rebut the last-antecedent presumption. The series-qualifier rule provides that a modifying phrase used to qualify one element of a list of nouns or verbs

---

[10] Courts commonly refer to this canon as the "last-antecedent rule," although the more precise term where, as here, the modifier is an adjectival or adverbial phrase is the "nearest reasonable referent" canon. Scalia & Garner at 152–53.

may sweep beyond the nearest referent if the list "contain[s] items that readers are used to seeing listed together or a concluding modifier that readers are accustomed to applying to each of them." *Lockhart*, 136 S. Ct. at 963. Importantly, that principle is generally limited to lists of items that are "simple and parallel without unexpected internal modifiers or structure." *Id.*; *see* Scalia & Garner at 147 (canon applies where "there is a straightforward, parallel construction that involves all nouns or verbs in a series"). The series-qualifier rule thus may support applying a modifier beyond its nearest referent and across multiple, simple, parallel phrases.

But the structure of section 1084(a)'s first clause is not straightforward. The sports-gambling modifier is embedded within a longer modifier: "assisting in the placing of bets or wagers on any sporting event or contest." Reading "on any sporting event or contest" alone to carry backward to modify the prohibition on "bets or wagers" would "take[] more than a little mental energy" and be a "heavy lift." *Lockhart*, 136 S. Ct. at 963 (rejecting the applicability of the series-qualifier rule to the phrase "aggravated sexual abuse, sexual abuse, or abusive sexual conduct involving a minor or ward"). Nor is there any other textual evidence that would justify departing from the usual presumption that modifiers apply only to their closest referents. *See United States v. Hayes*, 555 U.S. 415, 425 (2009) (declining to apply that rule because it would introduce superfluity and would require accepting the ungrammatical premises "that Congress employed the singular 'element' to encompass two distinct concepts, and that it adopted the awkward construction 'commi[t]' a 'use'"); *see also Paroline v. United States*, 572 U.S. 434, 447 (2014) (declining to apply the rule of the last antecedent because it was overcome by other indicia of meaning). We therefore do not believe that the series-qualifier rule warrants extending the sport-gambling modifier across both prohibitions in the first clause.

This conclusion is confirmed by comparing the structure of the sports-gambling modifier with other phrases in section 1084(a)'s first clause that do apply across multiple phrases. For instance, in speaking of "information assisting in the placing of *bets or wagers* on any sporting event or contest" (emphasis added), Congress employed a structure making clear that both "bets" and "wagers" were modified by the phrases that come before and after those items. "Bets" and "wagers" are two like items in the series, and it is straightforward to modify them with the phrases that immediately precede ("information assisting in the placing of") and follow ("on any sporting event or contest") those terms. Applying the last-

antecedent rule so that the prohibition would instead cover "information assisting in the placement of bets" and "wagers on sporting events or contests" would also introduce superfluity, since section 1084(a)'s first prohibition already extends to wire transmissions of "bets or wagers." To take another example, the phrase "sporting event or contest" is a textbook example of a simple, parallel structure where "sporting" modifies both "event" and "contest." *See* Scalia & Garner at 147–48 (providing similar examples and citing authorities); *cf.* 2011 Opinion, 35 Op. O.L.C. __, at *12 n.11 (concluding the same, although for different reasons). In contrast with such simple constructions, the sports-gambling modifier is embedded in a more complex structure that does not easily allow that modifier to extend beyond its immediate referent.

Section 1084(a) similarly limits both prohibitions in the first clause to interstate wire transmissions. Congress prefaced both prohibitions with the phrase "*for the transmission in interstate or foreign commerce of* bets or wagers or information assisting in the placing of bets or wagers on any sporting event or contest." 18 U.S.C. § 1084(a) (emphasis added). In context, the "transmission" must be "of" what is mentioned in the following phrase. By placing the interstate-commerce requirement before the word "of," Congress made clear that the entire phrase preceding "of"— "the transmission in interstate or foreign commerce"—would apply to the first two prohibitions. Otherwise, the second prohibition would be missing a preposition: "for the transmission . . . information assisting in the placing of bets or wagers on any sporting event or contest." But there are no similar indicators that would support rebutting the last-antecedent presumption and applying the sports-gambling modifier to the first prohibition.

The road not taken is also illuminating. Simply by adding two commas, Congress could have unambiguously extended both prohibitions in the first clause to sports-related gambling: "for the transmission in interstate or foreign commerce of bets or wagers[,] or information assisting in the placing of bets or wagers[,] on any sporting event or contest." *See* 2011 Opinion, 35 Op. O.L.C. __, at *5 (recognizing that if the text contained "commas after *each* reference to 'bets or wagers,'" it would have made the opinion's interpretation "much more certain"). Congress "could have easily" crafted text that would have carried that meaning, but did not. *Marx v. Gen. Revenue Corp.*, 568 U.S. 371, 384 (2013). The absence of these commas is particularly significant because it leaves "nothing in the statute to rebut the last-antecedent presumption." *In re Sanders*, 551 F.3d

at 400. Because "Congress no doubt could have worked around this grammatical rule had it wished . . . we see nothing in the section to justify dispensing with this default rule of interpretation." *Id*. The sports-gambling modifier therefore does not limit the first prohibition of section 1084(a)'s first clause, which makes it a crime to transmit "bets or wagers," including those unrelated to sports gambling.

## B.

We likewise conclude that section 1084(a)'s second clause is not limited to sports gambling. The second clause prohibits the use of a wire communication facility "for the transmission of a wire communication which entitles the recipient to receive money or credit as a result of bets or wagers, or for information assisting in the placing of bets or wagers." 18 U.S.C. § 1084(a). That clause, on its face, applies to bets or wagers of any kind, even those unrelated to sports.

We do not think it tenable to read into the second clause the qualifier "on any sporting event or contest" that appears in the first clause. Carrying that qualifier forward to the second clause is even less textually plausible than carrying it backward to the first prohibition of the first clause. As a matter of basic grammar, section 1084(a)'s first clause is distinct from the second clause; the two clauses are separated not only by a comma, but also by an introductory determiner that repeats the beginning of the first clause ("for the transmission of"). There is no reference to "any sporting event or contest" in that clause and no apparent textual reason why the modifier in the first clause would extend to the second clause.

Nor does any canon of construction support reading the sports-gambling modifier transitively across the two clauses. As our analysis of the first clause demonstrates, the series-qualifier principle would appear the most natural candidate to justify such a reading. But here, the sports-gambling modifier appears after the second of four statutory prohibitions. It would take a considerable leap for the reader to carry that modifier both backward to the first prohibition of the first clause, then forward across the entire second clause. *See, e.g.*, *United States v. Lockhart*, 749 F.3d 148, 152–53 (2d Cir. 2014) ("[T]his is not the prototypical situation in which the series qualifier canon is applied, since . . . the modifier does not end the list in its entirety."), *aff'd*, 136 S. Ct. 958 (2016); *Wong v. Minn. Dep't of Human Servs.*, 820 F.3d 922, 928 (8th Cir. 2016) ("[T]he series-qualifier canon generally applies when a modifier precedes or follows a

list, not when the modifier appears in the middle."); *cf. Koons Buick Pontiac GMC, Inc. v. Nigh*, 543 U.S. 50, 61–62 (2004) (applying a qualifier at the end of the second item on a list to the first item as well, based in part on specific textual evidence that the second item modified the first item).

Other portions of the Wire Act support this reading. Section 1084(b) uses the phrase "sporting event[s] or contest[s]" three times to define the scope of exceptions to section 1084(a)'s prohibitions. Subsection (b) exempts the transmission "of information for use in news reporting of *sporting events or contests*," then exempts "the transmission of information assisting in the placing of bets or wagers on *a sporting event or contest* from a State or foreign country where betting on that *sporting event or contest* is legal into a State or foreign country in which such betting is legal" (emphases added). That language illustrates that Congress repeated the sports-gambling modifier when applying that term beyond its nearest, and most natural, referent. "When Congress includes particular language in one section of a statute but omits it in another," we presume "that Congress intended a difference in meaning." *Digital Realty Tr., Inc. v. Somers*, 138 S. Ct. 767, 777 (2018) (quoting *Loughrin v. United States*, 134 S. Ct. 2384, 2390 (2014) (internal quotation marks and alteration omitted)); *Rubin v. Islamic Republic of Iran*, 138 S. Ct. 816, 826 (2018) (rejecting a proposed reading of a statutory provision on the ground that if Congress wanted the provision to have the claimed effect "it knew how to say so").

By contrast, section 1084(d) creates a notice-and-disconnect regime for common carriers, which must discontinue services to subscribers upon notice that the subscribers are using, or will use, their facilities "for the purpose of transmitting or receiving gambling information in interstate or foreign commerce in violation of Federal, State or local law." Section 1084(d), however, contains none of the sports-gambling qualifiers that appear in section 1084(a) or (b), and section 1084(d) contains no indication that it is limited to gambling information involving sporting events or contests. The absence of that modifier in section 1084(d) was presumably intentional. We thus cannot regard Congress's decision to omit the modifier from the second clause of section 1084(a) as an accident.

Our 2011 Opinion concluded that the sports-gambling modifier applied to section 1084(a)'s second clause, reasoning that Congress had used "shortened phrases in the second clause to refer back to terms spelled out more completely in the first clause." 35 Op. O.L.C. __, at *7. We ob-

served that the first clause prohibits the use of a wire communication facility for "the transmission *in interstate or foreign commerce*" of the prohibited bets or information, but that the second clause prohibits the use of the facility just for "the transmission of a wire communication" without repeating again the words "in interstate or foreign commerce." *Id*. Citing the views of the Criminal Division and the legislative history, we concluded that Congress "presumably intended *all* the prohibitions in the Wire Act, including those in the second clause, to be limited to interstate or foreign (as opposed to intrastate) wire communications." *Id*. Because the interstate-commerce qualifier could apply to both clauses, we concluded that the second clause used the phrase "for the transmission of a wire communication" as shorthand for both the interstate-commerce modifier and the sports-gambling modifier. *Id*.

We disagree with this inference, however, because the interstate-commerce modifier and the sports-gambling modifier are not parallel phrases. Within the grammar of the statute, the interstate-commerce element reaches beyond its nearest referent to modify at least the second prohibition as well as the first. *See* 18 U.S.C. § 1084(a) ("for the transmission *in interstate or foreign commerce of* bets or wagers *or* information assisting in the placing of bets or wagers") (emphases added). Both prohibitions are tied by prepositional phrases to the "transmission in interstate or foreign commerce." By contrast, there is no similar textual indication that the sports-gambling modifier ranges beyond its nearest referent: "information assisting in the placing of bets or wagers." In addition, the interstate-commerce modifier appears at the beginning of a list of four prohibitions, and so there is precedent to support carrying the modifier forward to modify the prohibitions in the second clause. *See United States v. Bass*, 404 U.S. 336, 339–40 (1971) ("Since 'in commerce or affecting commerce' undeniably applies to at least one antecedent, and since it makes sense with all three, the more plausible construction here is that it in fact applies to all three."). By contrast, the sports-gambling modifier appears midway through the list, which does not support the shorthand reference suggested by our 2011 Opinion. In view of these textual differences, we do not believe that the interstate-commerce modifier helps us to interpret the sports-gambling modifier. If anything, the textual differences underscore why the sports-gambling modifier does not apply across the statute.

In sum, the linguistic maneuvers that are necessary to conclude that the sports-gambling modifier sweeps both backwards and forwards to reach

all four of section 1084(a)'s prohibitions are too much for the statutory text to bear. *See Lockhart*, 749 F.3d at 152–53; *Wong*, 820 F.3d at 928. For these reasons, we conclude that the phrase "on any sporting event or contest" does not extend beyond the second prohibition in section 1084(a)'s first clause to qualify section 1084(a)'s second clause.

## C.

Having concluded the text was ambiguous, our 2011 Opinion reasoned that reading the Wire Act's prohibitions as limited to sports gambling "produce[d] the more logical result." 35 Op. O.L.C. __, at *5; *see also id*. at *7 (applying the sports-gambling modifier across all four prohibitions "made[] functional sense of the statute"). We found it "difficult to discern why Congress, having forbidden the transmission of *all* kinds of bets or wagers, would have wanted to prohibit only the transmission of information assisting in bets or wagers concerning sports." *Id*. at *5. There is a logic to this reasoning, but unlike the 2011 Opinion, we view the statutory language as plain, and, absent a patent absurdity, we must apply the statute as written. *See Dunn v. CFTC*, 519 U.S. 465, 470 (1997).

We do not think that applying the Wire Act as written would result in an interpretation "where it is quite impossible that Congress could have intended the result . . . and where the alleged absurdity is so clear as to be most obvious to most anyone." *Pub*. *Citizen v*. *U.S. Dep't of Justice*, 491 U.S. 440, 470–71 (1989) (Kennedy, J., concurring in judgment); *see* Scalia & Garner at 237 ("The absurdity must consist of a disposition that no reasonable person could intend."). Congress may well have had reasons to target the transmission of information assisting in sports gambling. Unlike lotteries, numbers games, or other kinds of non-sports gambling, sports gambling has long depended on the real-time transmission of information like point spreads, odds, or the results of horse races. Indeed, in concluding that the Wire Act was limited to sports gambling, our 2011 Opinion quoted the legislative history in which Senator Eastland, the Chairman of the Judiciary Committee, emphasized that illegal bookmaking required the use of the wires, because bookmakers and betters needed real-time results of horse "races at about 20 major racetracks throughout the country." 35 Op. O.L.C. __, at *9 (quoting 107 Cong. Rec. 13,901 (1961)). Moreover, Congress might have been worried that an unfocused prohibition on transmitting any information that "assisted" in any sort of gambling whatsoever would criminalize a range of speech-related con-

duct—concerns that Congress evidently had in mind when it narrowed section 1084(a)'s prohibitions by excepting transmissions made "for use in news reporting of sporting events or contests." 18 U.S.C. § 1084(b). We need not speculate further. It is sufficient that Congress targeted the transmission of information assisting in sports gambling in the text, and that applying the Wire Act as written does not produce an obviously absurd result.

In our 2011 Opinion, we found it improbable that Congress would have failed to prohibit "the transmission of information assisting in the placing of bets or wagers on non-sporting events," but then, in section 1084(a)'s second clause, prohibited transmissions "entitling the recipient to receive money or credit for the provision of information assisting in the placing of those lawfully-transmitted bets." 35 Op. O.L.C. __, at *8.[11] But improbable is not absurd, and that anomaly largely falls away if, as we have concluded, transmitting bets or wagers of any kind is indeed unlawful under section 1084(a)'s first clause. *See supra* Part II.A. It was not absurd for Congress to supplement a broad prohibition on transmitting information that assists sports gambling in the first clause with another prohibition on a particular species of transmissions concerning all forms of gambling: those that entitle a recipient to money or credit for information that assists in the placing of unlawfully transmitted bets and wagers. Even if these prohibitions were anomalous, however, that result would simply reflect the statutory text. It is the job of the Executive to faithfully execute those words, and that of Congress to fix or improve those laws as it sees fit. *See Exxon Mobil Corp. v. Allapattah Servs.*, 545 U.S. 546, 565 (2005) (If there is an "unintentional drafting gap," "it is up to Congress rather than the courts to fix it. The omission may seem odd, but it is not absurd.").

Our 2011 Opinion also relied heavily upon the legislative history of the 1961 Wire Act. Citing the many references in the legislative history to sports gambling and the dearth of references to other forms of gambling,

---

[11] Similar results would follow even if section 1084(a) were limited to sports gambling. If it were so limited, section 1084(a)'s first clause would allow people to relay sports bets and wagers so long as they did not use the wires to do so—yet the second clause would prohibit wire transmissions entitling the recipients to receive money or credit for those bets and wagers. The primary conduct of betting would not be prohibited under the Wire Act, yet the wire transmission entitling the bettor to payment would be a criminal offense under that statute.

the opinion concluded that "Congress's overriding goal in the Act was to stop the use of wire communications for sports gambling in particular." 35 Op. O.L.C. __, at *8; *see id*. at *8–10. That may well have been true. But "statutory prohibitions often go beyond the principal evil to cover reasonably comparable evils, and it is ultimately the provisions of our laws rather than the principal concerns of our legislators by which we are governed." *Oncale v. Sundowner Offshore Servs., Inc*., 523 U.S. 75, 79 (1998); *see also Encino Motorcars, LLC v. Navarro*, 138 S. Ct. 1134, 1142, 1143 (2018) (declining to attach significance to the fact that the legislative history of the Fair Labor Standards Act "discusses 'automobile salesmen, partsmen, and mechanics' but never discusses service advisors," because "[e]ven if Congress did not foresee all of the applications of the statute, that is no reason not to give the statutory text a fair reading").

Our 2011 Opinion also emphasized the drafting history of the Wire Act. As we explained it, an earlier draft of the bill was unequivocally limited to sports gambling. When the Senate Judiciary Committee substantially redrafted the provision to change it to its current form, the Committee removed the commas that had so clearly limited the initial prohibitions to sporting events and contests. Our 2011 Opinion could not identify evidence in the legislative history that when Congress reworked the provision, it intended "to expand dramatically the scope of prohibited transmissions from 'bets or wagers . . . on any sporting event or contest' to *all* 'bets or wagers,' or to introduce a counterintuitive disparity between the scope of the statute's" different prohibitions. 35 Op. O.L.C. __, at *6. The committee reports, for instance, did not suggest that these changes dramatically expanded the Wire Act's coverage. Given that such substantial changes "would have significantly altered the scope of the statute," our 2011 Opinion read the "absence of comment" to be significant. *Id*. at *7.

But we do not share the 2011 Opinion's confidence that silence in the legislative history on those revisions is so probative. As the Supreme Court recently observed, "if the text is ambiguous, silence in the legislative history cannot lend any clarity," and "if the text is clear, it needs no repetition in the legislative history." *Encino Motorcars*, 138 S. Ct. at 1143; *see also Avco Corp. v. U.S. Dep't of Justice*, 884 F.2d 621, 625 (D.C. Cir. 1989) ("[S]ilence in legislative history is almost invariably ambiguous. If a statute is plain in its words, the silence may simply mean that no one in Congress saw any reason to restate the obvious."). Here, the text is clear, and thus, even if so inclined, we would not have a justifica-

tion for delving into the Congressional Record to ascertain what individual Members of Congress may have thought at the time. It is the words of the statute that the President signs into law, and in so doing, "it is not to be supposed that . . . the President endorses the whole Congressional Record." *Schwegmann Bros*. *v*. *Calvert Distillers Corp*., 341 U.S. 384, 396 (1951) (Jackson, J., concurring). As the Supreme Court recently emphasized, "'[i]t is the business of Congress to sum up its own debates in its legislation,' and once it enacts a statute, 'we do not inquire what the legislature meant; we ask only what the statute means.'" *Epic Sys*. *Corp*. *v*. *Lewis*, 138 S. Ct. 1612, 1631 (2018) (quoting *Schwegmann Bros*., 341 U.S. at 396 (Jackson, J., concurring) (some internal quotation marks omitted)). Congress left the authoritative record of its deliberations in the text of the statute, and we rely solely upon its plain meaning to govern our interpretation here.[12]

## III.

In view of our conclusion that the Wire Act applies to non-sports gambling, the Criminal Division has asked us to revisit the question that our 2011 Opinion did not need to answer, namely whether the 2006 enactment

---

[12] Even if we were to consider the legislative history, there are multiple inferences one could reasonably draw from the progression of the legislation through Congress. The 2011 Opinion quoted concerns expressed by Senator Kefauver (the leader of the Senate's 1950s investigation into organized crime), who pressed a Department of Justice witness on why the draft Wire Act did not reach numbers games and other forms of non-sports-based gambling. 35 Op. O.L.C. __, at *10 n.7. Shortly after that hearing, the Judiciary Committee added the new language to change the prohibitions of the bill to their enacted form; in so doing, it removed the commas that had limited the draft prohibitions to sporting events and contests. Our 2011 Opinion concluded from this chain of events that Congress did not intend that change to extend the Wire Act's prohibitions to non-sports gambling. *Id*. at *6–7. But one might just as well speculate that the Judiciary Committee made such changes to respond to Senator Kefauver's urging that the Wire Act reach non-sports gambling. Here then, as in other instances, the legislative record provides grounds for alternative interpretations of what the Members may have intended. *See Exxon Mobil*, 545 U.S. at 568 (The "investigation of legislative history has a tendency to become, to borrow Judge Leventhal's memorable phrase, an exercise in 'looking over a crowd and picking out your friends.'" (quoting Patricia Wald, *Some Observations on the Use of Legislative History in the 1981 Supreme Court Term*, 68 Iowa L. Rev. 195, 214 (1983)); *see also* Scalia & Garner at 377 ("With major legislation, the legislative history has something for everyone."). Rather than relying upon suppositions concerning Members' intent, however, we view the relevant record to be the unambiguous words of the statute.

of UIGEA modifies the scope of the Wire Act. *See* Memorandum for John P. Cronan, Principal Deputy Assistant Attorney General, Criminal Division, from David C. Rybicki, Deputy Assistant Attorney General, Criminal Division, *Re: The Interaction Between UIGEA and the Wire Act* at 2 (Aug. 28, 2018). Specifically, the Criminal Division has asked whether, in excluding certain activities from UIGEA's definition of "unlawful Internet gambling," UIGEA excludes those same activities from the prohibitions under other federal gambling laws. *Id.* We conclude that it does not.

Congress enacted UIGEA to strengthen the enforcement of existing prohibitions against illegal gambling on the Internet. 31 U.S.C. § 5361(4). UIGEA prohibits anyone "engaged in the business of betting or wagering" from "knowingly accept[ing]" various kinds of payments "in connection with the participation of another person in unlawful Internet gambling." *Id.* § 5363. UIGEA defines "unlawful Internet gambling" as follows:

> IN GENERAL.—The term "unlawful Internet gambling" means to place, receive, or otherwise knowingly transmit a bet or wager by any means which involves the use, at least in part, of the Internet where such bet or wager is unlawful under any applicable Federal or State law in the State or Tribal lands in which the bet or wager is initiated, received, or otherwise made.

*Id.* § 5362(10)(A). That term, however, "does not include" certain enumerated activities. *Id.* § 5362 (10)(B)–(D). For instance, UIGEA excludes from coverage certain bets or wagers that are "initiated and received or otherwise made exclusively within a single State" and done so in accordance with the laws of such State, even if the routing of those wire transmissions was done in a manner that involved interstate commerce. *Id.* § 5362(10)(B).

UIGEA's definition of "unlawful Internet gambling" simply does not affect what activities are lawful under the Wire Act. This definition applies only to the "subchapter" in which UIGEA is contained, 31 U.S.C. § 5362, and the Wire Act does not use the term "unlawful Internet gambling" in any event. Our conclusion follows from the plain meaning of the statutory definition, and Congress has confirmed it with a reservation clause stating that "[n]o provision of this subchapter shall be construed as altering, limiting, or extending any Federal or State law or Tribal-State compact prohibiting, permitting, or regulating gambling within the United States." *Id.* § 5361(b). UIGEA therefore in no way "alter[s], limit[s], or extend[s]" the existing prohibitions under the Wire Act.

## IV.

For the reasons explained, we conclude that our 2011 Opinion conflicts with the plain language of the Wire Act. We emphasize, however, that we employ considerable caution in departing from our prior opinions, and we therefore think it appropriate to explain in detail why reconsideration is warranted here. This Office, exercising authority delegated by the Attorney General, provides binding legal advice within the Executive Branch. *See* 28 U.S.C. § 511; 28 C.F.R. § 0.25(a); Memorandum for the Attorneys of the Office, from David J. Barron, Acting Assistant Attorney General, Office of Legal Counsel, *Re: Best Practices for OLC Legal Advice and Written Opinions* at 1 (July 16, 2010) ("2010 Best Practices Memo"), https://www.justice.gov/sites/default/files/pages/attachments/2014/07/11/olc-best-practices-2010.pdf; Memorandum for the Attorneys of the Office, from Steven G. Bradbury, Principal Deputy Assistant Attorney General, Office of Legal Counsel, *Re: Best Practices for OLC Opinions* at 1 (May 16, 2005) ("2005 Best Practices Memo"), https://www.justice.gov/sites/default/files/pages/attachments/2014/07/11/olc-best-practices-2005.pdf. Although the Judicial Branch's doctrine of stare decisis does not itself apply to the Executive Branch, we embrace the long tradition of general adherence to executive branch legal precedent, reflecting strong interests in efficiency, institutional credibility, and the reasonable expectations of those who have relied on our prior advice. This tradition of respect for Department precedent predates the establishment of this Office and reflects the longstanding practice of Attorneys General in providing legal advice.[13]

---

[13] *See, e.g.*, *Import Duties—Warehoused Goods*, 21 Op. Att'y Gen. 23, 24 (1894) ("A [definitional] question once definitely answered by one of my predecessors and left at rest for a long term of years should be reconsidered by me only in a very exceptional case," and "reconsideration" would only be appropriate if predicate assumptions on which the past advice relied were no longer correct); *Camel's Hair Noils—Drawback*, 24 Op. Att'y Gen. 53, 55 (1902) ("[Attorney General] Olney's opinion, although brief, is evidently based on careful consideration of all aspects of the case. It is not perhaps accurate, . . . but I concur in the principle of my predecessor's ruling, and perceive no sufficient reason to revise the same. A question once definitely answered by one of my predecessors and left at rest for a long term of years should be reconsidered by me only in a very exceptional case." (internal citations omitted)); *see also* Trevor W. Morrison, *Stare Decisis in the Office of Legal Counsel*, 110 Colum. L. Rev. 1448, 1471–74 (2010) (discussing the historical practice of stare decisis within the Department of Justice).

Reconsidering past opinions without considering these interests "could easily lead to requests for reconsideration of earlier Opinions on other subjects," thereby undermining the value of our legal advice. Memorandum for the Attorney General, from Malcolm R. Wilkey, Assistant Attorney General, Office of Legal Counsel, *Re: Gifts from Foreign Governments, CP-58-80 of May 14, 1958*, at 3 (May 15, 1958). Accordingly, we "should not lightly depart from such past decisions, particularly where they directly address and decide a point in question." 2010 Best Practices Memo at 2; *accord* 2005 Best Practices Memo at 2.

We nevertheless have recognized that, "as with any system of precedent, past decisions" of our Office "may be subject to reconsideration and withdrawal in appropriate cases and through appropriate processes." 2010 Best Practices Memo at 2. We have departed from our prior advice for a range of reasons. In many instances, we have withdrawn precedents when intervening developments in the law appear to cast doubt upon our conclusions.[14] We have also modified earlier advice where the factual predicates have shifted or we have come to a better understanding of them. *See, e.g.*, *Scope of Treasury Department Purchase Rights with Respect to Financing Initiatives of the U.S. Postal Service*, 19 Op. O.L.C. 238, 238, 243, 244 (1995) (upon being asked to "reconsider and rescind" a 1993 opinion, we "reaffirmed and clarified" that opinion but, after gathering information from the agencies and learning that one agency was not operating in the manner anticipated by the statute or by us, we modified one of its conclusions).

In other instances, however, we have reconsidered our advice after identifying errors in the supporting legal reasoning.[15] We have, for exam-

---

[14] *See, e.g.*, Memorandum for the Files, from Steven G. Bradbury, Principal Deputy Assistant Attorney General, *Re: Status of Certain OLC Opinions Issued in the Aftermath of the Terrorist Attacks of September 11, 2001*, at 2 (Jan. 15, 2009) ("Bradbury Memo on 9/11 Opinions") (withdrawing certain post-9/11 opinions because, among other things, their legal reasoning had "been overtaken by subsequent decisions of the Supreme Court and by legislation passed by Congress and supported by the President"); *Authority of the Department of the Interior to Provide Historic Preservation Grants to Historic Religious Properties Such as the Old North Church*, 27 Op. O.L.C. 91, 117 (2003) ("Perhaps more important, recent Supreme Court decisions have brought the demise of the 'pervasively sectarian' doctrine that comprised the basis . . . the 1995 Opinion of this Office.").

[15] *See, e.g.*, *Application of Anti-Nepotism Statute to Presidential Appointment in White House*, 41 Op. O.L.C. __, at *9–14 (Jan. 20, 2017) (describing our past opinions as legally erroneous as an initial matter and overtaken by subsequent developments in the law);

ple, modified our position regarding whether the Appointments Clause applies to private entities who perform functions on behalf of the federal government.[16] And we have revisited precedents that themselves had reversed established positions of the Executive Branch.[17]

Several factors justify reconsideration here. Although the 2011 Opinion directly addressed the question now before us, we believe that the 2011 Opinion devoted insufficient attention to the statutory text and applicable canons of construction, which we believe compel the conclusion that the prohibitions of the Wire Act are not uniformly limited to sports gambling. Furthermore, the 2011 Opinion is of relatively recent vintage and departed

---

*Definition of Torture under 18 U.S.C. §§ 2340–2340A*, 28 Op. O.L.C. 297, 304 n.17 (2004) ("We do not believe [these statutory sources] provide a proper guide for interpreting 'severe pain' in the very different context of the prohibition against torture in sections 2340–2340A."); *Reconsideration of Applicability of the Davis-Bacon Act to the Veteran Administration's Lease of Medical Facilities*, 18 Op. O.L.C. 109 (1994) (reversing the conclusions reached in *Applicability of the Davis-Bacon Act to the Veterans Administration's Lease of Medical Facilities*, 12 Op. O.L.C. 89 (1988)); *Authority of the Federal Bureau of Investigation To Override International Law In Extraterritorial Law Enforcement Activities*, 13 Op. O.L.C. 163 (1989) (disapproving the conclusion reached in *Extraterritorial Apprehension by the Federal Bureau of Investigation*, 4B Op. O.L.C. 543 (1980), that the FBI lacked authority to apprehend a fugitive in a foreign state in a manner contrary to customary international law).

[16] *Compare The Constitutional Separation of Powers Between the President and Congress*, 20 Op. O.L.C. 124, 146 n.65 (1996) ("disapprov[ing of] the Appointments Clause analysis and conclusion of an earlier opinion of this Office," and finding that the Appointments Clause does not apply to private entities), *with Officers of the United States Within the Meaning of the Appointments Clause*, 31 Op. O.L.C. 73, 121 (2007) (reversing the 1996 opinion's conclusion that the Appointments Clause does not apply to private entities).

[17] *See, e.g.*, *Validity of Statutory Rollbacks as a Means of Complying with the Ineligibility Clause*, 33 Op. O.L.C. __, at *1 (May 20, 2009) (reconsidering 1987 OLC opinion that "was not in accord with the prior interpretations of this Clause by the Department of Justice and has not consistently guided subsequent practice of the Executive Branch" and did not "reflect[] the best reading of the Ineligibility Clause" of the Constitution); Memorandum for the Files, from Steven G. Bradbury, Principal Deputy Assistant Attorney General, Office of Legal Counsel, *Re: October 23, 2001 OLC Opinion Addressing the Domestic Use of Military Force to Combat Terrorist Activities* at 2 (Oct. 6, 2008) (overturning post-9/11 precedent that had departed from "the longstanding interpretation of the Executive Branch," under which "any particular application of the Insurrection Act to authorize the use of the military for law enforcement purposes would require the presence of an actual obstruction of the execution of federal law or a breakdown in the ability of state authorities to protect federal rights").

from established Department practice, which included successful prosecutions under a broader understanding of the Wire Act and repeated representations to Congress about the Department's views. *See supra* Part I. The Department's position prior to our 2011 Opinion, indeed, may have informed Congress's action in 2006 in enacting the UIGEA, which prohibited the acceptance of payment in connection with "unlawful Internet gambling," but expressly declined to alter, limit, or extend any federal laws "prohibiting, permitting, or regulating gambling within the United States." 31 U.S.C. § 5361(b).

Reaching a contrary conclusion from our prior opinion will also make it more likely that the Executive Branch's view of the law will be tested in the courts. We have sometimes relied on that likelihood in considering whether the Executive should decline to enforce or defend unconstitutional statutes. *See Presidential Authority to Decline to Execute Unconstitutional Statutes*, 18 Op. O.L.C. 199, 201 (1994); *Recommendation that the Department of Justice Not Defend the Constitutionality of Certain Provisions of the Bankruptcy Amendments and Federalist Judgeship Act of 1984*, 8 Op. O.L.C. 183, 193–94 (1984). We likewise believe it relevant in determining whether to depart from our precedent. Under our 2011 Opinion, the Department of Justice may not pursue non-sports-gambling-related prosecutions under the Wire Act. But under the conclusion we adopt today, such prosecutions may proceed where appropriate, and courts may entertain challenges to the government's view of the statute's scope in such proceedings. While the possibility of judicial review cannot substitute for the Department's independent obligation to interpret and faithfully execute the law, that possibility does provide a one-way check on the correctness of today's opinion, which weighs in favor of our change in position.

We acknowledge that some may have relied on the views expressed in our 2011 Opinion about what federal law permits. Some States, for example, began selling lottery tickets via the Internet after the issuance of our 2011 Opinion.[18] But in light of our conclusion about the plain language of

---

[18] *See, e.g.*, John Byrne, *Quinn Says Online Lottery Sales Could Start in Spring*, Chi. Tribune (Dec. 27, 2011), http://www.chicagotribune.com/news/local/politics/chi-quinn-says-online-lottery-sales-could-start-in-spring-20111227-story.html (explaining that "following a U.S. Justice Department ruling that the Internet sales [of state lottery tickets] are legal," the Governor of Illinois planned to move forward with plans to sell lottery tickets on the Internet); State of Illinois, Office of Management and Budget, Illinois

the statute, we do not believe that such reliance interests are sufficient to justify continued adherence to the 2011 opinion.[19] Moreover, if Congress finds it appropriate to protect those interests, it retains ultimate authority over the scope of the statute and may amend the statute at any time, either to broaden or narrow its prohibitions.

## V.

We conclude that the prohibitions of 18 U.S.C. § 1084(a) are not uniformly limited to gambling on sporting events or contests. Only the second prohibition of the first clause of section 1084(a), which criminalizes transmitting "information assisting in the placing of bets or wagers on any sporting event or contest," is so limited. The other prohibitions apply to non-sports-related betting or wagering that satisfy the other elements of section 1084(a). We also conclude that section 1084(a) is not modified by UIGEA. This opinion supersedes and replaces our 2011 Opinion on the subject.

STEVEN A. ENGEL
*Assistant Attorney General*
*Office of Legal Counsel*

---

Performance Reporting System, Agency Performance Metric Reports FY18 Quarter 4 (Aug. 14, 2018 3:53 PM), https://www.illinois.gov/gov/budget/IPRS%20Reports/458_ Department_of_the_Lottery.pdf ("Internet sales" of Illinois lottery tickets were about $20 million in FY 2017 and in FY 2018).

[19] An individual who reasonably relied upon our 2011 Opinion may have a defense for acts taken in violation of the Wire Act after the publication of that opinion and prior to the publication of this one. *See, e.g.*, *United States v. Pa. Indus. Chem. Corp.*, 411 U.S. 655, 673–74 (1973); *Cox v. Louisiana*, 379 U.S. 559, 568–69 (1965). The reliance interest implicit in any such defense, however, does not bear upon our reconsideration of the 2011 Opinion.