# United States Court of Appeals
## For the First Circuit

No. 18-1783

MUNICIPALITY OF SAN JUAN; TOA ALTA COMPREHENSIVE URBAN/RURAL
ADVANCED HEALTH SERVICES, INC.; RIO GRANDE COMMUNITY HEALTH
CENTER, INC.,

Plaintiffs,

MIGRANT HEALTH CENTER, INC.; CORP. DE SERVICIOS INTEGRALES DE
SALUD INTEGRAL DE LA MONTANA, INC.; MOROVIS COMMUNITY HEALTH
CENTER, INC.; CORPORACION DE SERVICIOS DE SALUD Y MEDICINA
AVANZADA, INC. (COSSMA); HEALTHPROMED FOUNDATION, INC., f/k/a
Dr. Jose S. Belaval, Inc.; CONCILIO DE SALUD INTEGRAL DE LOIZA,
INC. (CSILO); NEOMED CENTER, INC., f/k/a Gurabo Community Health
Center, Inc.; CIALES PRIMARY HEALTH CARE SERVICES, INC.;
CORPORACION DE SERV. MEDICOS PRIMARIOS Y PREVENCION DE HATILLO,
INC.; COSTA SALUD, INC., f/k/a Rincon Health Center, Inc.; CAMUY
HEALTH SERVICES, INC.; ATLANTIC MEDICAL CENTER, INC.; CENTRO DE
SALUD FAMILIAR DR. JULIO PALMIERI FERRI, INC.; HOSPITAL GENERAL
CASTANAR, INC.; EL CENTRO DE SERVICIOS PRIMARIOS DE SALUD DE
PATILLAS, INC.; EL CENTRO DE SALUD DE LARES, INC.,

Plaintiffs, Appellees,

v.

COMMONWEALTH OF PUERTO RICO,

Defendant, Appellant,

DEPARTMENT OF HEALTH OF COMMONWEALTH OF PUERTO RICO; DEPARTMENT
OF HEALTH AND HUMAN SERVICES; RAFAEL RODRIGUEZ-MERCADO,
Secretary of the Department of Health for the Commonwealth of
Puerto Rico; ALEX MICHAEL AZAR, II, Secretary of Health and
Human Services,

Defendants.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

[Hon. Gustavo A. Gelpí, Jr., U.S. District Judge]

———————————

Before

Lynch, Thompson, and Barron,
Circuit Judges.

———————————

Carlos Lugo-Fiol, with whom Isaías Sánchez-Báez, Solicitor General of Puerto Rico, was on brief, for appellant.

James L. Feldesman, with whom Nicole M. Bacon, Khatareh S. Ghiladi, and Feldesman Tucker Leifer Fidell LLP were on brief, for appellees Atlantic Medical Center, Inc., Camuy Health Services, Inc., Centro de Salud Familiar Dr. Julio Palmieri Ferri, Inc., Ciales Primary Health Care Services, Inc., Corp. de Serv. Médicos Primarios y Prevención de Hatillo, Inc., Costa Salud, Inc., Centro de Salud de Lares, Inc., Centro de Servicios Primarios de Salud de Patillas, Inc., and Hospital General Castañer, Inc.

Robert A. Graham, with whom Iyen A. Acosta and Reno & Cavanaugh PLLC were on brief, for appellees HealthproMed, Salud Integral en la Montaña, Migrant Health Center, COSSMA, Morovis Community Health Center, NeoMed Center, and Concilio de Salud Integral de Loiza.

———————————

March 21, 2019

———————————

**BARRON**, **Circuit Judge**.  This appeal concerns the automatic stay provision of the Puerto Rico Oversight, Management, and Economic Stability Act ("PROMESA"), see 48 U.S.C. §§ 2101-2241, a statute that Congress enacted in June 2016 to address the Commonwealth of Puerto Rico's financial crisis.  The question presented is whether that automatic stay applies to certain proceedings to determine the amount of federal court-ordered payments (which the parties refer to as "prospective wraparound payments") that the Commonwealth owes to several federally qualified health centers ("FQHCs") per a 2010 injunction.  Those proceedings arise out of Medicaid litigation that has been ongoing against the Commonwealth for sixteen years in the United States District Court for the District of Puerto Rico.

The litigation began in June of 2003, when several FQHCs sought to enjoin the Secretary of the Department of Health of Puerto Rico from failing to reimburse them -- through what are known as "wraparound payments" -- for their reasonable costs of providing services to Medicaid patients, as required under the Medicaid Act, 42 U.S.C. § 1396a(bb).

This appeal arises from a motion that the Commonwealth filed in that litigation on May 30, 2018.  The motion notified the District Court that the Commonwealth, through the Financial Oversight and Management Board for Puerto Rico (the "Oversight

- 3 -

Board"),[1] had filed for bankruptcy under Title III of PROMESA in May of 2017. The motion stated that, in consequence, the litigation was subject to the automatic stay that Title III imposes. The District Court entered an order on July 11, 2018, in which it ruled that the automatic stay did not apply. We now reverse.

## I.

We begin by recounting the following undisputed facts. They concern, in the main, the travel of the litigation that has led to the present dispute over whether the Title III automatic stay applies to the wraparound payment litigation.

The parties to this appeal are the Commonwealth, which is the appellant, and a number of FQHCs, which are the appellees. The parties are connected to one another because the Commonwealth contracts managed care organizations ("MCOs") to run its Medicaid program. The MCOs, in turn, contract with FQHCs to provide medical assistance to Medicaid patients.

---

[1] The Oversight Board is the Commonwealth's representative in any case filed under Title III of PROMESA. 48 U.S.C. § 2175(b). We recently held that the process for appointing the Oversight Board members was unconstitutional under the Appointments Clause of the United States Constitution, U.S. Const. art. 2, U.S.C. § 2, cl. 2. Aurelius Inv., LLC v. Puerto Rico, 915 F.3d 838, 862 (1st Cir. 2019). However, we did not order the dismissal of the Oversight Board's Title III petitions, nor did our ruling nullify any otherwise valid actions of the Oversight Board that were taken prior to the issuance of mandate in that case. Id.

Under the Medicaid Act, the Commonwealth is a state, 42 U.S.C. § 1301(a)(1), and thus must reimburse the FQHCs' total "reasonable" costs for providing Medicaid services, id. § 1396a(bb). Because the Commonwealth operates its Medicaid program through MCOs, the Medicaid Act requires the Commonwealth to cover the difference between what the FQHCs receive from the MCOs directly and the "reasonable" costs that the FQHCs would receive under the Medicaid Act's default payment scheme. Id. § 1396a(bb)(5)(A).

Such "supplemental payment[s]" -- known as "wraparound payments" -- are due to the FQHCs "in no case less frequently than every 4 months." Id. § 1396a(bb)(5)(B). In 1997, Congress provided that states must make these wraparound payments via a detailed calculation scheme, known as the prospective payment system ("PPS"). See id. § 1396a(bb)(2)-(3). Congress made the PPS effective after fiscal year 2000. Id.

The longstanding litigation at issue in this case began in June 2003, when several FQHCs sued the Secretary of the Department of Health of Puerto Rico in the District of Puerto Rico under 42 U.S.C. § 1983. Concilio de Salud Integral de Loiza, Inc. v. Pérez-Perdomo, 551 F.3d 10, 11 (1st Cir. 2008). The FQHCs alleged that the Commonwealth had failed both to implement a PPS and to issue the wraparound payments required under the Medicaid Act. Rio Grande Cmty. Health Ctr., Inc. v. Rullan, 397 F.3d 56,

- 5 -

65 (1st Cir. 2005). The FQHCs sought declaratory relief, injunctive relief for the establishment of a PPS and interim emergency wraparound payments, and attorney's fees and costs. Id. On January 7, 2004, the FQHCs moved for a preliminary injunction, which the District Court granted on November 1, 2004. Concilio de Salud Integral de Loiza, Inc., 551 F.3d at 12.

In consequence of the 2004 preliminary injunction, the Commonwealth began to make wraparound payments to the FQHCs pursuant to a series of orders that calculated the required payments according to a "rough methodology" that the District Court had adopted. Id. The methodology that the District Court adopted differed from the ones proposed by the FQHCs (whose proposed methodology would have resulted in higher payments) and by the Commonwealth (whose proposed methodology would have resulted in lower payments). Id. at 12-14.

In 2007, however, the Commonwealth's payments under that methodology stopped, when the District Court vacated the preliminary injunction based on the Commonwealth's establishment of a permanent PPS Office. Id. at 14. The FQHCs appealed that order, and, in 2008, we reversed. Id. at 19. In doing so, we suggested that the District Court appoint a Special Master to assist in addressing the complex Medicaid payment calculations at issue in this case. Id.

The District Court appointed a Special Master in May of 2009. The Special Master began assisting the District Court with the process of updating the rates and formulas for the wraparound payments owed by the Commonwealth -- a process known as "rebasing." The Special Master issued a series of reports and recommendations as to the amount due to each FQHC for the period from June 2006 to July 2009.

The District Court adopted the Special Master's recommendations in a preliminary injunction that it issued on November 8, 2010 ("2010 Injunction"). See Preliminary Injunction, Consejo de Salud Playa Ponce v. Pérez-Perdomo, No 06-1260 (D.P.R. Nov. 8, 2010), ECF No. 743; Consejo de Salud de la Comunidad de la Playa de Ponce, Inc. v. González-Feliciano, 695 F.3d 83, 90 (1st Cir. 2012). That preliminary injunction required the Commonwealth to make prospective wraparound payments to the FQHCs from that point going forward.[2] Id.

In consequence of the 2010 Injunction, the Commonwealth makes some payments to the FQHCs based on the Special Master's 2006 to 2009 calculations. Although there have been some adjustments to the payment amounts (e.g. for fluctuation in the

---

[2] The District Court found that the Eleventh Amendment barred the full payment of the amounts calculated by the Special Master and therefore ordered only the payment of prospective payments as of the date of its order. See Preliminary Injunction, Consejo de Salud, No. 06-1260 (D.P.R. Nov. 8, 2010), ECF No. 743.

total federal Medicaid population) over the course of the eight years that the 2010 Injunction has been in effect, the rebasing process must be completed before the final amount of the wraparound payments due to the FQHCs can be determined.

In order to facilitate the completion of that process, the Special Master held a series of meetings and issued three separate rebasing reports, to which the FQHCs objected. On April 12, 2017, the Special Master issued a fourth rebasing report that proposed changes to the formulas and procedures used to calculate the wraparound payments.[3]

Alongside this ongoing litigation in federal court -- in which FQHCs are seeking what are referred to by the parties as prospective wraparound payments -- a nearly identical group of FQHCs is involved in related litigation against the Commonwealth in the Commonwealth's local courts. See Rio Grande Cmty. Health Ctr., Inc., 397 F.3d at 64. The FQHCs involved in this parallel litigation sued the Commonwealth on May 10, 2002, about a year before the federal suit commenced. In that suit, the FQHCs sought

---

[3] We note that, in continuing to make its quarterly payments using the 2006 to 2009 calculations, the Commonwealth has not adjusted its payments to account for the revised formula that the Special Master has set forth in these recent reports. For example, the Special Master's understanding of the term "visit" -- which is a foundational component of the calculation -- has changed since the issuance of the 2010 injunction.

to require the Commonwealth to make <u>retroactive</u> wraparound payments to the FQHCs dating back to 1997.[4]

Amidst this ongoing litigation in the federal and Puerto Rico courts, the Commonwealth, on May 3, 2017, through the Oversight Board, filed for bankruptcy under Title III of PROMESA. As relevant here, PROMESA incorporates sections of the United States Bankruptcy Code, including a provision imposing an automatic stay of

> the commencement or continuation . . . of a judicial, administrative, or other action or proceeding against the debtor that was or could have been commenced before the commencement of the case under this title, or to recover a claim against the debtor that arose before the commencement of the case under this title[.]

11 U.S.C. § 362(a)(1) (incorporated in 48 U.S.C. § 2161(a)). The filing of the Title III petition prompted proceedings in both the District of Puerto Rico and the Commonwealth's local courts about whether the automatic stay applied to the wraparound payment litigation.

In the litigation in the Puerto Rico courts, the Court of Appeals of Puerto Rico took notice of the Title III petition and decided, on June 30, 2017, that the automatic stay applied to the wraparound litigation over which it had jurisdiction. <u>See</u>

---

[4] The FQHCs were barred from pursuing the retroactive payments in federal court under the Eleventh Amendment. <u>See</u> <u>id.</u> at 64-65; <u>see also</u> <u>Consejo de Salud</u>, 695 F.3d at 102-05.

- 9 -

Asociación de Salud Primaria de Puerto Rico, Inc. v. Estado Libre Asociado de Puerto Rico, 2017 WL 3842832 (P.R. Cir. June 30, 2017). The FQHCs did not seek review or challenge the applicability of the stay to the litigation in the Puerto Rico courts. See Motion for Abstention, In re Financial Oversight and Management Board for Puerto Rico, No. 17-0227 (D.P.R. Nov. 14, 2017), ECF No. 29 at 8. The FQHCs instead filed a notice of removal to the Title III Court on August 2, 2017. See Notice of Removal, In re Financial Oversight and Management Board, No. 17-0227 (D.P.R. Aug. 2, 2017), ECF No. 1 at 7.

The Title III Court, on July 10, 2018, modified the automatic stay to allow the local court litigation to proceed to judgment but maintained the stay as to the execution or enforcement of a final judgment. See Memorandum Order, In re Financial Oversight and Management Board, No. 17-0227 (D.P.R. July 10, 2018), ECF No. 64.[5] Relatedly, on November 27, 2018, the Title III Court

_____

[5] The Commonwealth had first filed a motion for abstention on November 14, 2017, seeking to continue moving the case forward in the local Puerto Rico courts and proposing to modify the automatic stay such that it would apply only to the execution or enforcement of a judgment. See Motion for Abstention, In re Financial Oversight and Management Board, ECF No. 29. In opposing the Commonwealth's motion on December 5, 2017, the FQHCs argued (for what appears to be the first time) that the automatic stay did not apply to the litigation at issue. See Opposition to Request for Abstention, In re Financial Oversight and Management Board, No. 17-0227 (D.P.R. December 5, 2017), ECF No. 38. On April 2, 2018, the Magistrate Judge recommended that the Title III Court grant the Commonwealth's motion for abstention and that the Title III Court modify the

found that the issue of whether the FQHCs' claims would ultimately be nondischargeable was not yet ripe for review. See Memorandum Order, In re Financial Oversight and Management Board for Puerto Rico, No. 17-0278 (D.P.R. Nov. 27, 2018), ECF No. 65 at 5-8.

In the parallel prospective federal court litigation from which this appeal arises, however, things have not been so straightforward. On May 10, 2017, a week after the Title III petition was filed, the District Court entered an order adopting the Special Master's fourth rebasing report (issued on April 27, 2017). Rio Grande Comm. Ctr., Inc. v. Puerto Rico, No. 03-1640 (D.P.R. May 10, 2017), ECF No. 1007. The FQHCs then appealed that order on June 21, 2017, without making any mention of the Title III petition.

In the course of the FQHCs' appeal from the District Court's order adopting the Special Master's fourth rebasing report, our Court issued an order in December of 2017 directing

---

automatic stay to allow the litigation to proceed to judgment, as the Commonwealth proposed in its motion. See Report and Recommendation, In re Financial Oversight and Management Board, No. 17-0227 (D.P.R. April 2, 2018), ECF No. 55. The FQHCs opposed the Magistrate Judge's recommendation but did not again raise their argument in the Title III Court that the stay did not apply. See Plaintiffs' Objections, In re Financial Oversight and Management Board, No. 17-0227 (D.P.R. April 30, 2018), ECF No. 60. However, the FQHCs recently appealed the Title III Court's order granting the Commonwealth's motion for abstention and modifying the automatic stay. See Centro de Salud Familiar J.P.F. v. Commonwealth of Puerto Rico, No. 19-1189 (1st Cir. Feb. 25, 2019), ECF No. 1.

the FQHCs to show cause whether PROMESA's Title III automatic stay applied to any part of their appeal of the District Court's May 10, 2017 order. See Atl. Med. Ctr., Inc. v. Dep't of Health of Puerto Rico, No. 17-1812 (1st Cir. Dec. 21, 2017), ECF No. 13. The FQHCs responded by arguing that the automatic stay did not apply, by pointing to specific provisions of PROMESA. The Commonwealth argued in response that the stay applied under the plain language of Section 362(a)(1) of the Bankruptcy Code, as incorporated by Section 301(a) of PROMESA.

On March 1, 2018, we entered an "abeyance-and-deferral" order holding that appeal in abeyance "pending further proceedings in the Commonwealth of Puerto Rico's Title III case for the protective lifting of the automatic stay (to the extent that it applies)." Atl. Med. Ctr., Inc., No. 17-1812 (1st Cir. Mar. 1, 2018), ECF No. 23. At that point, the Commonwealth filed a motion before the District Court on May 30, 2018. Rio Grande Comm. Ctr., Inc. v. Puerto Rico, No. 03-1640 (D.P.R. May 30, 2018), ECF No. 1107. In that motion, the Commonwealth notified the District Court of the Commonwealth's Title III bankruptcy proceedings and of the status of the appeal of the District Court's May 10, 2017 order in the prospective wraparound payment litigation.

The Commonwealth stated in its motion that it would

> continue to deposit the Quarterly Interim Wraparound payments as they stand, in compliance with the Court's injunctive order

- 12 -

> as it has consistently done in the past few years. Nothing in PROMESA disturbs the Government of Puerto Rico's public policy regarding the services provided under Medicaid and the compliance <u>with the prospective payment</u> to assure the service is rendered.

Id. (emphasis in original). Nevertheless, the Commonwealth asserted in its motion that this "pre-petition claim" is subject to the automatic stay. Id. The FQHCs opposed the Commonwealth's position in a motion arguing that the application of the automatic stay would impermissibly impair their rights.

The District Court entered an order on July 11, 2018, in which it ruled that the automatic stay did not apply and thus that the proceedings regarding the rebasing calculations could continue. The Commonwealth now appeals from that order.

## II.

We begin with the jurisdictional issues that this appeal presents. We start with a question concerning our appellate jurisdiction. We then consider the Commonwealth's contention that the District Court lacked subject matter jurisdiction to decide whether the automatic stay applies.

## A.

The Commonwealth asserts that we have appellate jurisdiction because the District Court's order denying the applicability of the PROMESA automatic stay, like an order granting relief from the automatic stay in the ordinary bankruptcy context,

is a final, appealable order.  28 U.S.C. § 1291.  The FQHCs do not dispute the point.  We nevertheless address the issue, because it is jurisdictional and because we have not previously had occasion to do so.

The Commonwealth relies for its assertion about our appellate jurisdiction on Tringali v. Hathaway Machinery Co., 796 F.2d 553, 558 (1st Cir. 1986), in which we reviewed an order of a district court sitting in bankruptcy.  There, we held, in the context of an ordinary bankruptcy, that a district court's order granting relief from the automatic stay established by Section 362 of the Bankruptcy Code was a final appealable order under 28 U.S.C. § 1291.[6]  And, all other circuits to have addressed that issue have ruled similarly.  See 1 Collier on Bankruptcy ¶ 5.09 (collecting cases).  Moreover, the only circuits that have addressed the issue have treated a ruling as to whether the Section 362 automatic stay applies in the ordinary bankruptcy context as being no different -- for purposes of 28 U.S.C. § 1291 -- from an order as to whether to grant or deny relief from such a stay.  See Rajala v. Gardner, 709 F.3d 1031, 1034 (10th Cir. 2013) ("[T]he district court's order, which deemed § 362 inapplicable to the judgment proceeds,

_____

[6] We note that 28 U.S.C. § 158(d) is the statute that establishes the federal courts of appeals' jurisdiction to review bankruptcy appeals.  Because the appeal now before us arises from nonbankruptcy litigation in district court, it falls within the scope of 28 U.S.C. § 1291, a statute of general appealability. See Tringali, 796 F.2d at 558.

- 14 -

was essentially an order granting relief from the automatic stay."); In re Quigley Co., 676 F.3d 45, 51 (2d Cir. 2012) (holding that a decision on the automatic stay's applicability is "the equivalent of a decision . . . on a motion seeking relief from a stay").

We have not previously had occasion to address whether the equation between these types of orders concerning the automatic stay is apt even in the ordinary bankruptcy context, let alone whether such an equation would be apt in the PROMESA context. We note that we recently held that a district court's denial of relief from PROMESA's Section 405 automatic stay, 48 U.S.C. § 2194(a)-(b), the precursor to PROMESA's Title III automatic stay, is not necessarily a final, appealable order under 28 U.S.C. § 1291 in every circumstance. See Peaje Invs. LLC v. García-Padilla, 845 F.3d 505, 510-11 (1st Cir. 2017). And we did so by referencing our similar caselaw in the analogous bankruptcy context.

In particular, we explained in Peaje Investments that "in the analogous bankruptcy context, we have held that the denial of relief from a stay is not necessarily a final decision sufficient to confer appellate jurisdiction. But such a decision is final where it 'conclusively decide[s] the fully-developed, unreviewable-elsewhere issue that triggered the stay-relief fight.'" Id. (citing In re Atlas IT Exp. Corp., 761 F.3d 177, 185 (1st Cir. 2014)). And, in In re Atlas, we further explained that

- 15 -

appellate jurisdiction "depends on the circumstances[,]" including the "particular order's reasoning and effect." 761 F.3d at 185. For example, we clarified that we would not have appellate jurisdiction over a denial that was "based on circumstances that [were] rapidly changing and on [a] record[] that [was] not fully developed." Id.

Nevertheless, here, there are no rapidly changing circumstances, and the record is fully developed in the relevant respects. Thus, our reasoning in Peaje Investments and In re Atlas does appear to accord with the conclusion of the other circuits that treat an order like the one at issue here as final and appealable under 28 U.S.C. § 1291.

In so concluding, we recognize that, although the order at issue here is -- consistent with Tringali, Peaje Investments, and In re Atlas -- "final" in the "more flexible . . . bankruptcy context," Rajala, 709 F.3d at 1036, it does not "end the litigation on the merits," but rather "ensures that litigation will continue in the District Court." Gulfstream Aerospace Corp. v. Mayacamas Corp., 485 U.S. 271, 275 (1988) (internal quotation marks and citations omitted). But, even if that feature of this order might be thought to raise a question as to whether it is "final" within the meaning of 28 U.S.C. § 1291, it is still appealable under the collateral order doctrine. See Cohen v. Beneficial Indus. Loan Corp., 337 U.S. 541, 546 (1949).

- 16 -

There is no question that the order denying the applicability of the statutorily-prescribed, automatic stay "conclusively determine[s] the disputed question," Gulfstream Aerospace Corp., 485 U.S. at 276 (quoting Coopers & Lybrand v. Livesay, 437 U.S. 463, 468 (1978)), and that it was "made with the expectation that [it would] be the final word on the subject addressed," Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp., 460 U.S. 1, 12 n.14 (1983). Cf. Gulfstream Aerospace Corp., 485 U.S. at 278 (holding that an order denying a motion to stay an order under Colorado River abstention because "the district court may well have determined only that it should await further developments before concluding that the balance of factors to be considered . . . warrants a . . . stay"). In addition, the order "resolve[s] an important issue completely separate from the merits of the action." Gulfstream Aerospace Corp., 485 U.S. at 276 (quoting Coopers & Lybrand, 437 U.S. at 468). Finally, the Commonwealth's protection from litigation under the automatic stay is "effectively unreviewable on appeal from a final judgment." Id.

**B.**

Having established our appellate jurisdiction, we now consider the Commonwealth's contention that the District Court did not have jurisdiction to entertain the FQHCs' motions opposing the applicability of the stay. "Where pertinent facts are not in

- 17 -

dispute, we review the district court's determination of subject matter jurisdiction de novo." Ortiz-Espinosa v. BBVA Sec. of Puerto Rico, Inc., 852 F.3d 36, 42 (1st Cir. 2017).

The basis for the Commonwealth's jurisdictional argument is our March 1, 2018 order in which we held the FQHCs' appeal of the District Court's May 10, 2017 order in abeyance. Specifically, the Commonwealth contends that "a federal district court and a federal court of appeals should not attempt to assert jurisdiction over a case simultaneously," Griggs v. Provident Consumer Discount Co., 459 U.S. 56, 58 (1982), and that, in consequence, the District Court lacked jurisdiction to issue its order finding that the automatic stay did not apply.

But, our March 1, 2018 order did not purport to divest the District Court from ruling on whether the automatic stay applied. That order expressly contemplated that, while we held the "appeals" pending before us in abeyance, there would be litigation below concerning precisely that issue. In fact, the order included, in referring to litigation over the lifting of the automatic stay, the parenthetical phrase: "to the extent that [the automatic stay] applies." See Atl. Med. Ctr., Inc., No. 17-1812 (1st Cir. Mar. 1, 2018), ECF No. 23 (emphasis added). The Commonwealth has misread and misunderstood our March 1, 2018 order.

It is not clear that the Commonwealth's argument is based on anything other than the March 1, 2018 order. Even if it is, we

- 18 -

still reject the argument. In the ordinary bankruptcy context, a district court has concurrent jurisdiction with a bankruptcy court to decide whether the automatic stay provision of Section 362 applies to its own proceedings. See In re Baldwin-United Corp. Litig., 765 F.2d 343, 347 (2d. Cir. 1985). And we see no basis for concluding that the rule is otherwise with respect to the District Court, the Title III Court, and the PROMESA automatic stay.

To be sure, the Second Circuit in In re Baldwin-United Corp. Litig. did hold that, although the district court in that litigation "had jurisdiction to determine the scope of the stay, its issuance of the injunction challenged on . . . appeal was a misuse of its equitable power." 765 F.2d at 347. But, the misuse there arose from "the injunction's prohibition of the debtor's opportunity to apply to the Bankruptcy Court for any relief under [11 U.S.C. § 105]," the possibility that the applicability of the stay would be "determined in various district courts throughout the country," and other factors regarding the particular filings in that case. Id. at 348-49.

Those circumstances are not present here. Nor does either party argue that, insofar as the District Court had jurisdiction to decide whether the automatic stay applies, as we hold that the District Court did, the District Court nonetheless misused its equitable authority by deciding that issue. See In re

Mid-City Parking, Inc., 332 B.R. 798, 805 (Bankr. N.D. Ill. 2005) ("[S]tate and federal courts handling nonbankruptcy litigation that is somehow tied to the filing of a federal bankruptcy case . . . [have] concurrent jurisdiction to initially determine whether § 362(a)-(b) stays the proceeding, but the federal bankruptcy forum may entertain a collateral attack on that ruling."). We turn, then, to the merits of the District Court's ruling concerning the stay's applicability.

## III.

The Commonwealth asserts that the District Court's determination that the Title III stay does not apply to this case was erroneous as a matter of law. The District Court based its determination on two provisions of PROMESA: Section 304(h), 48 U.S.C. § 2164(h), and Section 210(c), 48 U.S.C. § 2150(c).

The FQHCs contend that the District Court was correct in both respects. They add, however, that, even if we do not agree, we still may affirm the District Court's ruling based on either of two other provisions of PROMESA -- Section 7, 48 U.S.C. § 2106, and Section 204(d)(1), 48 U.S.C. § 2144(d)(1) -- which they argue also establish exceptions to the application of the automatic stay in this case. Finally, the FQHCs argue that PROMESA and other provisions of federal law, when read together, reveal that the Title III automatic stay has no application here.

"We review pure questions of statutory interpretation de novo."  United States v. Tobin, 552 F.3d 29, 32 (1st Cir. 2009) (citing United States v. Jaca-Nazario, 521 F.3d 50, 56 (1st Cir. 2008)).  Because we are "not confined to a consideration of the grounds relied on by the district court," United States v. Werra, 638 F.3d 326, 346 (1st Cir. 2011) (internal citations omitted), we consider not only the two provisions of PROMESA that the District Court relied upon for its ruling, but also the two provisions raised by the FQHCs, as well as the FQHCs' more holistic contention as to why the automatic stay does not apply.

**A.**

We start with the provision in PROMESA that indicates that this litigation is subject to an automatic stay.  That provision is Section 301(a) of PROMESA, 48 U.S.C. § 2161(a).

Section 301(a) expressly incorporates Section 362 of the Bankruptcy Code, which requires that, as soon as a bankruptcy petition is filed, pending litigation against the debtor is stayed automatically.  11 U.S.C. § 362(a)(1); see 3 Collier on Bankruptcy ¶ 362.03 (16th ed. 2018).  Neither Section 362 of the Bankruptcy Code nor Section 301(a) of PROMESA -- whether considered on their own or together -- provide any indication that the automatic stay is not fully applicable here.  Certainly, none of the enumerated exceptions to the stay's application that are set forth in the

- 21 -

Bankruptcy Code itself apply to this circumstance.  See 11 U.S.C. § 362(b).  Nor do the parties suggest otherwise.[7]

Furthermore, there is no indication that the automatic stay in Section 362 does not apply to injunctions. See 3 Collier on Bankruptcy ¶ 362.03 (16th ed. 2018) ("The stay includes actions seeking injunctive relief or similar relief as well as actions seeking money judgments . . . .  The stay provision of subsection (a)(1) is drafted so broadly that it encompasses all types of legal proceedings, subject only to the exceptions provided in section 362(b)."); see also Nat'l Tax Credit Partners, L.P. v. Havlik, 20 F.3d 705, 707-08 (7th Cir. 1994) (holding that the automatic stay applied to an injunction compelling payment that exercised control

_____

[7] The FQHCs do contend that this case does not fall within the scope of the automatic stay because it "is an action seeking return of [the FQHCs'] own property."  They argue in this regard that they are simply seeking payments from the Commonwealth that would cover the payments that they themselves have had to make, using the federal funding they receive under Section 330 of the Public Health Service Act, in consequence of the Commonwealth's failure to make its required wraparound payments.  However, this argument provides no basis for the conclusion that the case that the FQHCs have brought against the Commonwealth is not an "action or proceeding against the debtor that was or could have been commenced before the commencement of the case under" Title III. 11 U.S.C. § 362(a)(1) (incorporated in 48 U.S.C. § 2161(a)).  The FQHCs also state that the First Circuit "has recognized that federal funds are excluded from a bankruptcy estate where the debtor possesses no equitable interests in the funds."  See In re LAN Tamers, Inc., 329 F.3d 204, 209-15 (1st Cir. 2003).  But, the case upon which the FQHCs rely for this argument applies a provision of the Bankruptcy Code that PROMESA does not incorporate, id. (applying 11 U.S.C. § 541); see 48 U.S.C. § 2161(a) (incorporating specific provisions of Chapter 11, not including Section 541).

over the property of the debtor's estate); Matter of Mahurkar Double Lumen Hemodialysis Catheter Patent Litig., 140 B.R. 969, 977 (N.D. Ill. 1992) (Easterbrook, J., sitting by designation) (holding that the automatic stay applied to a request for an injunction against a debtor who was illegally using intellectual property rights). Rather, the text of 11 U.S.C. § 362(a)(1) "addresses all actions within the judicial power." Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Bradley, 756 F.2d 1048, 1052 & n.3 (4th Cir. 1985).

We note, too, that, in the ordinary bankruptcy context, the automatic stay is a "fundamental protection" that is meant to offer the debtor "breathing room during the period of financial reshuffling" and "protect[] the debtor's assets from disorderly, piecemeal dismemberment outside the bankruptcy proceedings." In re Smith, 910 F.3d 576, 580 (1st Cir. 2018) (internal quotation marks, citations, and alterations omitted). "And it enables the bankruptcy court to centralize all disputes concerning property of the debtor's estate so that reorganization can proceed efficiently, unimpeded by uncoordinated proceedings." Id. (internal quotation marks, citations, and alterations omitted). Nothing about those purposes is -- inherently -- at odds with the application here of the automatic stay that Section 301(a) expressly incorporates.

Thus, if we were to confine our analysis only to Section 301(a) and the provision of the Bankruptcy Code that it incorporates, it would be clear that the automatic stay does apply. Nevertheless, the FQHCs assert that, Section 301(a) notwithstanding, a number of provisions in PROMESA preclude the automatic stay's application to the wraparound payment litigation. In particular, they point to Sections 304(h), 210(c), 204(d)(1), and 7.[8] We thus address each of these provisions in turn.

**B.**

Section 304(h), on which the District Court relied for its ruling that the automatic stay does not apply here, states:

> (h) Public safety
> This chapter may not be construed to permit the <u>discharge</u> of obligations arising under Federal police or regulatory laws, including laws relating to the environment, public health or safety, or territorial laws implementing such Federal legal provisions. This includes compliance obligations, requirements under consent decrees or judicial orders, and obligations to pay associated administrative, civil, or other penalties.

48 U.S.C. § 2164(h) (emphasis added).

This provision directly references the Commonwealth's "obligations arising under Federal . . . laws," of which the Medicaid Act is certainly one. The District Court thus concluded that Section 304(h) operates as an exception to the automatic stay

---

[8] These four sections of PROMESA are codified at 48 U.S.C. §§ 2164(h), 2150(c), 2106, and 2144(d)(1), respectively.

provision that precludes its application to this case, given the Commonwealth's obligation to make the Medicaid wraparound payments that have been imposed by the 2010 Injunction that is in place.

But, by its terms, Section 304(h) bars only the "discharge" -- not the "stay" -- of "compliance obligations." And, looking at the context of this provision within PROMESA, which incorporates not only Section 362 of the Bankruptcy Code, but also, among others, 11 U.S.C. § 524 ("Effect of discharge"), 48 U.S.C. § 2161(a), the term "discharge" cannot mean, in all cases, "stay."

After all, a discharge in bankruptcy "permanently enjoins creditor actions to collect discharged debts." Internal Revenue Serv. v. Murphy, 892 F.3d 29, 38 (1st Cir. 2018) (quoting Bessette v. Avco Fin. Servs., Inc., 230 F.3d 439, 444 (1st Cir. 2000)). By contrast, an "automatic stay is similar to a temporary restraining order." Grella v. Salem Five Cent Sav. Bank, 42 F.3d 26, 33 n.8 (1st Cir. 1994) (quoting H.R. Rep. No. 95-595, at 344 (1977), as reprinted in U.S.C.C.A.N. 5787, 6300).

The FQHCs do argue that, because the federal obligation at issue is continuing in nature, it differs from a lump sum debt, such that even a stay of it amounts "effectively" to a discharge. However, the FQHCs' use of the word "effectively" reflects the fact that, on this record, a discharge -- which is what Section 304(h) precludes by its terms -- is not at issue here, only a stay is. After all, precisely because the compliance obligation is

- 25 -

continuing, the stay will not bring it to an end permanently. It will suspend it only temporarily. A discharge of that continuing obligation, by contrast, would bring an end to it altogether. For these reasons, we conclude that Section 304(h) cannot help the FQHCs, without purporting in doing so to address questions on other facts about what the term "discharge" may encompass.[9]

## c.

We consider, next, the second PROMESA provision that the District Court relied on for its ruling, Section 210(c):

> (c) Funding
> No Federal funds shall be <u>authorized</u> by this chapter for the payment of <u>any liability</u> of the territory or territorial instrumentality.

48 U.S.C. § 2150(c) (emphasis added).

The FQHCs assert that this provision bars application of the stay here. They contend that, if the stay were to apply, then "at least some [federal] funds might, through the reach of

---

[9] We note that, if the federal government itself chose to enforce the Commonwealth's compliance obligations under the Medicaid Act, such an enforcement action would be excepted from the automatic stay. <u>See</u> 11 U.S.C. § 362(b)(4); <u>Parkview Adventist Med. Ctr.</u> v. <u>United States</u>, 842 F.3d 757, 763 (1st Cir. 2016) ("The exception provision in § 362(b)(4) provides that the automatic stay of actions against the debtor does not apply to 'an action or proceeding by a governmental unit . . . to enforce such governmental unit's . . . police and regulatory power.' . . . [If] the governmental action is designed primarily to protect the public safety and welfare . . ., the government action . . . is exempt." (internal quotation marks and citations omitted)).

- 26 -

incorporated provisions of federal bankruptcy law or otherwise, wind up paying for the Commonwealth's liabilities[.]"

It is true that Medicaid is supported by both federal funds and the Commonwealth's own funds. Thus, it is true that, if the stay applies, the Commonwealth might not make complete payments to the FQHCs. But, the speculative possibility that the Commonwealth's failure to do so could, in turn, lead federal funds -- Medicaid or otherwise -- to be used to cover the FQHCs' costs provides no support for the contention that the application of the stay here would contravene this provision of PROMESA. The provision clearly bars the use of federal funds to be "authorized" by "this chapter" to cover the Commonwealth's liability. The provision is thus not implicated by the possibility that, in consequence of the application of the automatic stay, federal funds may "wind up" -- as the FQHCs put it -- covering a portion of the amount which the Commonwealth owes the FQHCs. Whether "federal funds" will ever be "authorized" is at best a hypothetical.

**D.**

We turn, then, to Section 204(d)(1), which provides:

(d) Implementation of Federal programs
In <u>taking actions</u> under this chapter, the Oversight Board shall not <u>exercise applicable authorities</u> to impede territorial actions taken to--
    (1) comply with a court-issued consent decree or injunction, or an administrative order or settlement with a Federal agency, with respect to Federal programs.

48 U.S.C. § 2144(d)(1) (emphasis added).

This provision could apply here, by its terms, only if the application of the automatic stay in and of itself could be understood to constitute an instance of the Oversight Board "taking action[]" or "exercis[ing] applicable authorities." However, the FQHCs have not explained to us why, exactly, the imposition of the automatic stay would constitute the Board "taking action[]" or "exercis[ing] applicable authorities." Instead, they simply suggest that the stay would "amount to an exercise of powers conferred through PROMESA." Without a clearer explanation of the basis for applying this exception, we cannot deny the application of the automatic stay, as it is, after all, automatic under Section 301(a) of PROMESA and the provision of the Bankruptcy Code that it incorporates.

Nor does an explanation clearly present itself from the text. We note that the operation of the automatic stay set forth in Section 362 of the Bankruptcy Code, per its incorporation by Section 301(a) of PROMESA, is merely the default consequence that follows from the Board's filing of a Title III petition. Thus, it is by no means obvious that the stay's application constitutes the Oversight Board "taking" a prohibited "action[]" or "exercis[ing]" a prohibited "authorit[y]" within the meaning of this provision. Rather, it would appear that the stay follows automatically,

without the Board taking any action or exercising any authority, from the filing of the Title III petition itself.  It would be nonsensical, however, to read this provision to bar the Oversight Board from making that filing.  Accordingly, we conclude that Section 204(d)(1), too, has no bearing on the applicability of the stay in this case.

**E.**

That leaves one last provision in PROMESA for us to consider, Section 7, which reads as follows:

> Except as otherwise provided in this chapter, nothing in this chapter shall be construed as impairing or in any manner relieving a territorial government, or any territorial instrumentality thereof, from compliance with Federal laws or requirements or territorial laws and requirements implementing a federally authorized or federally delegated program protecting the health, safety, and environment of persons in such territory.

48 U.S.C. § 2106 (emphasis added).

The FQHCs seize on the fact that the effect of the automatic stay would be to relieve the Commonwealth from "compliance with Federal laws and requirements," insofar as the stay would free the Commonwealth -- albeit temporarily -- from the preliminary injunction to which it is now subject in the wraparound litigation.  But, in pressing this contention, the FQHCs make no mention of the opening words of the provision -- "[e]xcept as otherwise provided in this chapter[.]"  Nor do they attempt to

grapple with the words that immediately follow -- "nothing in this chapter shall be construed[.]"  Instead, they direct all of their attention to the remaining words of the provision.

Because the FQHCs make no serious argument about the meaning or import of any of the opening words that we have just quoted, we conclude that they have failed to explain why Section 7 provides an exception to the otherwise automatic application of the stay here.  Nor is this a case in which the omission may be excused because it is clear that the unaddressed text supports the FQHCs' position.  If we consider the entirety of the provision's language, the text does not clearly require the FQHCs' desired construction, nor do the other indicia of statutory meaning clearly favor that result.  See In re Weinstein, 272 F.3d 39, 40 (1st Cir. 2001) (noting that courts must consider the text, context, legislative history, and underlying policies when interpreting a bankruptcy statute).

After all, the text comfortably bears a reading in which the phrase "[e]xcept as otherwise provided" means simply that nothing in PROMESA should be "construed" to impair any rights or obligations imposed by federal laws or requirements other than those that PROMESA itself "provides."  This reading would mean that where PROMESA expressly includes a provision that, by its plain terms, operates to "impair[] or in any manner reliev[e]" the Commonwealth "from compliance with Federal laws or requirements,"

then PROMESA controls, but that no provision in PROMESA should be "construed" to have such an effect if it would not have such an effect by the simple operation of its terms. Cf. McNely v. Ocala Star-Banner Corp., 99 F.3d 1068, 1074 (11th Cir. 1996) (noting that the ADA includes the language, "Except as otherwise provided in this chapter, nothing in this chapter shall be construed . . . ," in 42 U.S.C. § 12201(a), and concluding that the introductory clause of that provision "direct[ed] [the court] not to" apply the second half of the provision to other sections of the statute when it was "not warranted . . . under the plain language" of those other sections).

This reading of "[e]xcept as otherwise provided" would, of course, except the automatic stay provision from Section 7's scope. PROMESA, by virtue of Section 301(a), expressly incorporates 11 U.S.C. § 362, and the default operation of Section 362 in this case is to stay -- or temporarily "relieve" -- the Commonwealth's compliance with its federal obligations under the Medicaid Act.

In addition to the fact that this reading gives effect to all of the words of the statute, see United Sav. Assn. of Tex. v. Timbers of Inwood Forest Assocs., Ltd., 484 U.S. 365, 371 (1988) ("A provision that may seem ambiguous in isolation is often clarified by the remainder of the statutory scheme . . . because only one of the permissible meanings produces a substantive effect

that is compatible with the rest of the law."), it is also not precluded by the surrounding statutory context. See In re Weinstein, 272 F.3d at 43-45. The provision appears, after all, in the introductory section of PROMESA, and not in the more detailed sections that address adjustment of debts or responsibilities of the Oversight Board. Thus, Section 7 would appear to be designed to have a general application to the entire statute, rather than one that would specifically direct the circumstances in which to apply or not to apply Section 362 of the Bankruptcy Code, which is included in Section 301(a) of PROMESA.

The legislative history of the statute may be read to support this reading, too. See id. The House Committee Report to PROMESA states clearly that "[t]his section requires territories to continue compliance with all other Federal laws or requirements protecting health, safety, and the environment, as well as those territorial laws implementing Federally-authorized and delegated programs." H.R. Rep. No. 114-602, pt. 1, at 42 (2016) (emphasis added). Thus, Section 7 may be understood to have been intended to ensure that PROMESA would not supersede those federal requirements that PROMESA does not, by its terms, address. And, the inclusion of such a provision would seem prudent, given the novel federal statutory intervention into the Commonwealth's affairs that PROMESA represents.

Thus, the FQHCs have failed to explain why we should read this provision to indicate that PROMESA exempts from its scope a provision -- namely, Section 362 of the Bankruptcy Code -- that PROMESA expressly incorporates in Section 301(a) and that takes effect here by only the default operation of its terms. We thus conclude that Section 7, like the other provisions discussed, does not preclude the automatic stay's application in this case.

**F.**

The FQHCs' final contention is that all four of the above-mentioned PROMESA provisions must be considered in connection with the Medicaid Act and Section 330 of the Public Health Service Act. Specifically, the FQHCs contend that, by not making its required wraparound payments, the Commonwealth is in violation of the FQHCs' right to payment under the Medicaid Act, 42 U.S.C. § 1396a(bb)(5)(B), which is enforceable under 42 U.S.C. § 1983. Additionally, they argue, "if further proceedings in this case are stayed, this Court would be effectively allowing the illegal use of federal funds from one program (Section 330) to subsidize another (Medicaid)." The FQHCs contend that these clearly impermissible outcomes would not occur if the provisions of PROMESA that we have just reviewed are understood to support the conclusion reached by the District Court -- that the automatic stay that Section 301(a) of PROMESA incorporates does not apply here.

- 33 -

But, Section 362 of the Bankruptcy Code, and PROMESA by incorporation, does except from the stay an action brought by the federal government itself to enforce the Commonwealth's obligations under the Medicaid Act or otherwise.  See 11 U.S.C. § 362(b)(4) (incorporated in 48 U.S.C. § 2161(a)).  In addition, the FQHCs themselves may seek prompt relief from the stay in the Title III Court.  In fact, as we have already mentioned, in the parallel wraparound litigation in the Puerto Rico local courts, the Title III Court modified the automatic stay to allow the litigation to proceed to the point of judgment.  Considering that the Commonwealth itself proposed the granting of such relief to the Title III Court in that litigation, we have no reason to think that the Commonwealth would not be similarly supportive here.  See Motion for Abstention, In re Financial Oversight and Management Board for Puerto Rico, No. 17-0227 (D.P.R. Nov. 14, 2017), ECF No. 29 at 8.  In fact, during oral argument, the Commonwealth expressed its desire not to delay the proceedings.  Instead, it asserted that it wanted to make sure that the automatic stay was in effect only so that the FQHCs would not be able to collect on an ultimate judgment without guidance from the Title III Court -- once relief from the stay has been sought and obtained.  The Commonwealth expressed no interest in bringing to a halt the pre-judgment proceedings concerning rebasing.

**IV.**

The District Court's holding that the PROMESA stay does not apply is **<u>reversed</u>**, and the matter is remanded for proceedings consistent with this opinion.